OPINION
{¶ 1} Plaintiff-appellant the State of Ohio appeals from an order of the trial court suppressing evidence upon the ground that it was obtained as the result of an unlawful stop, search and seizure. The State contends that there was reasonable, articulable *Page 2 
suspicion justifying the stop. We disagree. Accordingly, the suppression order is Affirmed.
 II {¶ 2} One evening in early September, 2008, Matthew Locke, an eight-year veteran of the Dayton Police Force, was working the four-to-midnight shift as a uniformed officer patrolling an area in North Dayton. He was accompanied by a new recruit he was training, identified in the record only as "Officer Campbell."
 {¶ 3} At 8:20 p.m., Locke was dispatched to 3304 N. Main Street, "which is the Children Services Bureau entrance but the comments on the call said a two-story brick apartment building across the street and drugs and prostitution going on * * * were the comments." The information was received from an anonymous source. Locke already knew, from his experience with the area, that it had a reputation for drugs and prostitution. He had made a number of arrests in that area for drugs and for prostitution. {¶ 4} Driving by the front of the apartment building, Locke saw no one about, and nothing out of the ordinary. Locke made his way through an alley to the rear of the building. There was a paved parking area behind the apartment building, just large enough for three or four cars. Locke saw a green Pontiac parked there. Defendant-appellee Gary Sumlin was standing alongside, and leaning up against, the car. At this time, Locke did not see anyone else in, or in the area of, the Pontiac.
 {¶ 5} Locke described what happened next as follows:
 {¶ 6} "Q. What happened next?
 {¶ 7} "A. I got out of my car to approach him to talk to him. As I put the car in *Page 3 
park and got out of the car, that's when he started moving, not running but moving backwards towards — from the back of the car towards the passenger front door.
 {¶ 8} "Q. And Officer, when you pull in, is the defendant facing toward you so you can see his face?
 {¶ 9} "A. Yes, he's leaned up against the car with his arms like this.
 {¶ 10} "Q. Okay. He's looking out towards where you're pulling in.
 {¶ 11} "A. Yes.
 {¶ 12} "Q. So he can see you.
 {¶ 13} "A. Absolutely.
 {¶ 14} "Q. Okay. What happened next —
 {¶ 15} "A. Yeah, my cruiser's right in front of him. There's no way he could miss it.
 {¶ 16} "Q. So as he starts to back up, what happens next, Officer?
 {¶ 17} "A. As I get out of my cruiser and start to approach him, he continues to walk backwards. I don't know, you know, I'm thinking he's going to run — it's pretty common when you pull up on places of drug transactions go on to walk up on somebody and sometimes they run — so I told him don't move. He continued to move backwards. That's when I noticed that the passenger side door was partially open.
 {¶ 18} "Q. Officer, when you told the defendant not to run or move, did you have a weapon drawn at all?
 {¶ 19} "A. Initially, I didn't. He — also I couldn't see his hands. They were behind his back. And so as he moved towards the door — and the door was partially opened and the door continued to open further as he got closer to it — I told him to stop again *Page 4 
and he didn't. So that's when I drew my gun and pointed it at him and told him not to move.
 {¶ 20} "* * * *
 {¶ 21} "Q. Okay. Tell us what happens next * * * .
 {¶ 22} "A. As — in the back side of the door, as you're backing towards the door, the door is open. That's when I noticed that there's somebody sitting in the passenger side of the vehicle which is later found to be a female. As he gets back to the door and I point my gun at him and tell him to stop, that's when I see his hands come from behind his back where he's backed up against, with his back in the door, and then he rests his arm up on top of the open door. One arm on the door and one arm on the roof of the car and he's just standing there looking at me like that and that's when I walked up and grabbed ahold of him."
 {¶ 23} Locke patted Sumlin down, ultimately recovering both crack cocaine and marijuana from his person, and a gun that was visible on the passenger seat of the car. Sumlin made an incriminating statement to Locke after being arrested and being advised of his rights underMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
 {¶ 24} On cross-examination, Locke acknowledged that the anonymous tip did not add any information about the area that he was not already familiar with. He acknowledged that the alley is an access to a number of homes, and that the apartment building appeared to have four units in it. Locke acknowledged that he had no indication from anything that he observed Sumlin doing that would indicate that he was selling drugs. He further acknowledged that the report of drugs and prostitution "going on" *Page 5 
could imply inside or outside the apartment building, or six hours previously or more recently.
 {¶ 25} Also on cross-examination, Locke clarified that Sumlin had his hands in view when Locke and Campbell got out of the cruiser, "then his hands came down, they went behind his back and he moved backwards towards — "Locke did not see Sumlin grab anything or put his hands in his pockets. The only circumstance that Locke was able to identify as constituting a threat to himself was "me telling him to show me his hands and him refusing to do so."
 {¶ 26} Questioning by the trial court established that when Locke decided to get out of his cruiser, he intended to conduct aTerry[1] stop, and that when he did so, the only circumstances he had to rely upon for the stop were the area's reputation and the anonymous tip.
 {¶ 27} Sumlin was arrested and later charged by indictment with one count of Possession of Crack Cocaine, in an amount greater than 25 grams, but not exceeding 100 grams, and with one count of Having a Weapon Under a Disability. He moved to suppress the evidence obtained as a result of the stop, including the incriminating statement. After a hearing, the trial court found Sumlin's motion to be well-taken, and ordered the suppression of the evidence. From this order, the State appeals.
 II {¶ 28} The State's sole assignment of error is as follows:
 {¶ 29} "THE TRIAL COURT'S DECISION TO SUSTAIN GARY SUMLIN'S *Page 6 
MOTION TO SUPPRESS WAS ERROR BECAUSE OFFICER LOCKE ACTED REASONABLY IN SEIZING SUMLIN AND CONDUCTING A PAT-DOWN SEARCH FOR WEAPONS."
 {¶ 30} The trial court found that Sumlin was stopped when Locke drew his weapon, pointed it at Sumlin, and commanded Sumlin to stop. The trial court concluded that the facts and circumstances known to Locke at that time did not rise to the level of reasonable, articulable suspicion of criminal activity required for a brief, investigatory stop.
 {¶ 31} The State agrees with the trial court that the stop occurred when Locke drew his weapon, but disagrees with the trial court's conclusion that Locke lacked reasonable, articulable suspicion at that time. To the facts and circumstances supporting a suspicion of criminal activity, the State appends the fact that Sumlin failed to comply with Locke's earlier command, "don't move."
 {¶ 32} When Locke told Sumlin, "don't move," he was one of two uniformed police officers exiting a marked police cruiser. "Don't move" is neither a suggestion nor a polite invitation to chat. Had Sumlin obeyed this order, he would have been stopped by a command of a police officer exhibiting authority as a police officer. The problem is that Sumlin did not obey this order.
 {¶ 33} What is the Fourth Amendment significance of a disobeyed order to stop? If it has Fourth Amendment significance, then Locke was required to have a reasonable, articulable suspicion at the moment of having given the order. If it has no Fourth Amendment significance, because it was disobeyed, then it seems disingenuous to *Page 7 
argue, as the State does, that the disobeying of the order has Fourth Amendment significance, because this disobedience contributes to the suspicious nature of the suspect's activities. To give the disobeyed order that Fourth Amendment significance would mean that the order, although disobeyed, would have consequences impinging upon the freedom of movement of the subject — if the subject chooses to disobey the order, that will constitute a suspicious circumstance justifying a later order to stop. Thus, an initial order to stop that does not satisfy Fourth Amendment standards puts the subject of that order in the position of either obeying the unlawful order to stop, with the result that his liberty interests have been unlawfully infringed, or disobeying the unlawful order to stop, with the result that a subsequent order to stop can lawfully be made, because the additional suspicion resulting from the subject's failure to obey the first, unlawful order now validates a second order to stop. Either way, the subject's freedom of movement has been infringed as a result of the initial, unlawful order to stop.
 {¶ 34} It is clear from the facts in this record that no additional suspicious circumstances intervened between Locke's first and second orders to stop other than Sumlin's failure to obey the first order. Because we conclude that Sumlin's failure to have obeyed Locke's first order cannot properly be considered, there is no difference in the facts and circumstances surrounding the two orders that may properly be considered in determining whether the orders were supported by the requisite reasonable, articulable suspicion.
 {¶ 35} The State refers to the fact that Sumlin "kept his hands behind his back despite the officer's order to show his hands." This was not mentioned in Locke's direct testimony, but was alluded to on cross-examination during the following colloquy: *Page 8 
 {¶ 36} "Q. And despite your — the what you've described as your fear, not knowing what he had, fact is, Mr. Sumlin never did anything other than backing up when you told him to stop, he never took any offensive action. He never — you never saw him with a weapon in his hand, anything like that; is that correct?
 {¶ 37} "A. The only thing me telling him to show me his hands and him refusing to do so —
 {¶ 38} "Q. Okay.
 {¶ 39} "A. — is definitely a threat to me. Other than that, no."
 {¶ 40} There is no reference to a direction from Locke to Sumlin to show his hands other than this one, brief colloquy on cross-examination. It was not brought up in Locke's direct testimony, and it was not delved into on re-direct. If it happened, we don't know when, in the sequence of events, it happened.
 {¶ 41} More importantly, the trial court made extensive findings of fact, orally, in open court, when it rendered its decision, and it did not include any reference, in these findings of fact, to an order by Locke to Sumlin to show his hands, with Sumlin refusing to do so. We conclude, therefore, that the trial court either did not credit this aspect of Locke's testimony, or found it immaterial, since there was no indication when Sumlin's alleged refusal to show his hands occurred in relation to either order to stop.
 {¶ 42} The trial court's reasoning in support of its decision included the following:
 {¶ 43} "Simply walking backwards with your hands behind your back [is] not sufficient for the necessary reasonable articulable suspicion of criminal activity or that not necessary [sic] for the conclusion that a necessary reasonable articulable conclusion that the defendant, Mr. Sumlin, was armed and dangerous. *Page 9 
 {¶ 44} "* * * * .
 {¶ 45} "Further, the fact that another person was in the vehicle and the passenger door was opened, both innocent facts, do not change this conclusion.
 {¶ 46} "Finally, the anonymous tip is not a factor that I can look at in reaching the conclusion regarding this case, but the area's reputation is a factor but is not a sufficient factor under all the other facts and circumstances for me to come to the conclusion that Officer Locke had the required reasonable articulable suspicion that Mr. Sumlin was armed and dangerous to allow the pat-down search that occurred."
 {¶ 47} Because the discovery of the drugs and the firearm, as well as the incriminating statement, all occurred as a natural and probable result of the initial, unlawful stop, the trial court suppressed them all as evidence.
 {¶ 48} The State cites State v. Andrews (1991), 57 Ohio St.3d 86, for the proposition that the high-crime nature of the location, combined with the suspect's evasive action, was enough to support a reasonable, articulable suspicion of criminal activity. In that case, a police officer encountered a man "running between the buildings, away from the road and the police cruiser he had just seen, and towards him into the courtyard." Id., at 86. When the suspect saw the police officer, "he suddenly stopped and threw down what he was carrying in his hand." Id., at 88.
 {¶ 49} There are crucial differences between the facts in this case and in State v. Andrews, supra. In the case before us, Sumlin was never observed running from the police. He backed up, while facing the police, from a point where he was in physical contact with a car to another point where he was in physical contact with the same car, obviously not a great distance, and he was not running. This behavior does not imply an *Page 10 
intent to evade police pursuit in the same manner that was implied by the man seen running from the location of a police cruiser in State v.Andrews, supra. Also, in this case, Sumlin was not seen to have suddenly thrown down a carried object in reaction to seeing a police officer.
 {¶ 50} We agree with the trial court that the action of simply backing away, slowly, over a short distance, from two police officers exiting a police cruiser, in a high crime neighborhood, with ones hands behind ones back, is not sufficient to give rise to a reasonable, articulable suspicion that criminal activity is afoot, as required for a stop underTerry v. Ohio, supra.
 {¶ 51} The State's sole assignment of error is overruled.
 III {¶ 52} The State's sole assignment of error having been overruled, the suppression order from which this appeal is taken is Affirmed.
DONOVAN, P.J., and FROELICH, J., concur.
[1] Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889. *Page 1