[Cite as *State v. Thornton*, 2023-Ohio-1404.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 29653 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 01798 |
| | : | |
| NORMAN THORNTON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 28, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellant

JOSEPH M. RUSCH, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} The State of Ohio appeals from the trial court's decision granting Defendant-Appellee Norman Thornton's motion to suppress. The State contends that the trial court erred by finding that there was no reasonable articulable suspicion or probable cause to justify the stop and later seizure of Thornton. For the reasons outlined below, we agree and reverse the judgment of the trial court.

## I.      Factual and Procedural Background

{¶ 2} The Dayton Police Department's Strategic Response Unit ("SRU") consists of five to seven police officers whose primary goal, in an effort to curtail crime, is to patrol high-crime areas based upon statistics and data polling of drug and weapon complaints, as directed by their sergeant. On June 30, 2022, the SRU was tasked with patrolling the area of Kings Mill Court apartments located at 3522 Dorham Place, in Dayton, Ohio, from which complaints regarding drug sales and weapons had historically come.

{¶ 3} According to body-camera videos, at approximately 9:52 p.m. on June 30, 2022, five uniformed SRU officers, including Officers Joshua Erwin and Kyle Harris, parked their cruisers and walked toward the Kings Mill Court apartment complex parking lot. When the officers approached the lot, they heard loud music, observed three men standing near a parked truck, and spotted open containers of alcohol. As they moved toward the men, the officers shined their flashlights and introduced themselves as "Dayton Police." None of the officers had weapons drawn. The body-camera videos showed that the officers were some distance away from the three men when, immediately after the officers announced themselves, one of the men, later identified as Thornton, turned and ran. Within seconds, one officer said, "He's got a gun. I think he's got a gun," and the officers swiftly pursued Thornton. After less than a minute, Thornton was apprehended but no firearm was found on him. The officers then retraced the path of the pursuit and found a discarded firearm nearby.

{¶ 4} At 10:03 p.m., Thornton was placed in the police cruiser. When asked by an officer for personal identifying information, including his name, social security number,

and date of birth, Thornton made several unsolicited statements not in response to anything the officer had said and asked the officer if he could have his gun back once he was released.

{¶ 5} At 10:20 p.m., another officer opened the rear door of the cruiser and read Thornton his *Miranda* rights from a card. After each right was read, Thornton verbally acknowledged his understanding. Thornton was calm, did not appear to be under the influence of drugs or alcohol, and did not assert his right to remain silent or request an attorney. Thornton stated that he had not known that the individuals approaching him and the other two men were police officers before he began running and had not heard the officers say "Dayton Police."

{¶ 6} On July 11, 2022, Thornton was indicted on one count of having weapons while under disability (prior offense of violence) in violation of R.C. 2923.13(A)(2), a felony of the third degree, and one count of carrying concealed weapons (loaded/at hand) in violation of R.C. 2913.12(A)(2), a felony of the fourth degree.

{¶ 7} On September 12, 2022, Thornton filed a motion to suppress, arguing that the evidence of his possession of a firearm should be suppressed. Thornton argued that the stop and subsequent seizure of the firearm were accomplished in violation of the Fourth Amendment, as there had been no arrest or search warrant and his seizure had occurred without probable cause or reasonable articulable suspicion that he was engaging in illegal activity.

{¶ 8} At a hearing on the motion to suppress held on November 14, 2022, Officers Joshua Erwin and Kyle Harris testified for the State. Officer Harris testified that,

as the five SRU officers approached the three individuals in the parking lot intending to conduct an investigation and speak with them, one officer stated "stay put."

{¶ 9} Following the hearing, the trial court granted Thornton's motion, finding that the officers had conducted an investigatory detention of Thornton without having reasonable articulable suspicion of criminal activity when they approached to investigate in a large group, shined their flashlights, identified themselves as "Dayton Police," and said "stay put." The trial court found that a reasonable person would not have felt free to walk away under the circumstances in this case and that there had needed to be reasonable articulable suspicion that criminal activity was afoot, which was lacking, as there had been no warrant, no suspect, no complaint of drug sales or weapons possession, no shooting report, and no calls for service. The trial court found that there was no evidence that city ordinances or state statutes had been violated; there had been no complaints from neighbors or residents about loud music; and there was no evidence that Thornton had been intoxicated or consuming alcohol. The trial court further found that there had been a warrantless search and seizure and that no exception to the warrant requirement applied; that Thornton had been detained without reasonable articulable suspicion that criminal activity was afoot; that Thornton's flight had not contributed to a finding of reasonable articulable suspicion because he was confronted with an unlawful order to "stay put"; that evidence was obtained after the pursuit and seizure of Thornton; and that the evidence of the firearm and Thornton's identity were fruit of the poisonous tree and had to be suppressed.

{¶ 10} The State filed a timely notice of appeal on November 28, 2022.

## II.     Assignment of Error

{¶ 11} The State's sole assignment of error is as follows:

The trial court erred in granting Thornton's motion to suppress. The court incorrectly ruled that there was no reasonable or articulable suspicion to justify the *Terry* stop of Thornton.

{¶ 12} The State contends that the trial court improperly found that the police officers did not have reasonable articulable suspicion that criminal activity was occurring for the purpose of an investigatory detention of Thornton. As a result, according to the State, the motion to suppress should have been overruled by the trial court, and the trial court's judgment must be reversed. We agree.

{¶ 13}  "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).   "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

{¶ 14}  "The Fourth Amendment to the United States Constitution, and Section 14,

Article I of the Ohio Constitution, protect individuals from unreasonable searches and seizures conducted by police officers." (Citations omitted.) *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶ 12. The Fourth Amendment, however, is not implicated every time a police officer has contact with a citizen. *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995), citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "The United States Supreme Court has identified three categories of police-citizen contact to identify situations where the Fourth Amendment protections are implicated." (Citation omitted.) *State v. Crum*, 2d Dist. Montgomery No. 22812, 2009-Ohio-3012, ¶ 12, citing *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). These categories are: (1) consensual encounters; (2) investigatory detentions; and (3) seizures that are the equivalent of an arrest. *Taylor* at 747-749.

{¶ 15} "Consensual encounters are not seizures, and Fourth Amendment guarantees are not implicated in such encounters." *State v. Keister*, 2d Dist. Montgomery No. 29081, 2022-Ohio-856, ¶ 27, citing *Taylor* at 747-749, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *Mendenhall* at 553. Therefore, "[a] consensual encounter can occur when a police officer approaches and questions individuals in or near a parked car." (Citations omitted.) *State v. Schott*, 2d Dist. Darke No. 1415, 1997 WL 254141, *3 (May 16, 1997); *State v. Jones*, 188 Ohio

App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 20 (10th Dist.). Moreover, "[t]he request to check a person's identification does not make the encounter nonconsensual; nor does the request to check one's belongings." (Citation omitted.) *Crum* at ¶ 14. "The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." *Taylor* at 747-748. "Only once a person's liberty has been restrained has the encounter lost its consensual nature and [it] falls into a separate category beyond the scope of a consensual encounter." (Citations omitted.) *Crum* at ¶ 14.

{¶ 16} The second type of encounter is a "*Terry* stop" or an investigatory detention, which is more intrusive than a consensual encounter but less intrusive than a formal custodial arrest. *Taylor* at 748. "Unlike consensual encounters, an investigatory detention constitutes a seizure; therefore, Fourth Amendment protections are implicated in an investigatory detention." (Citations omitted.) *State v. Shern*, 2d Dist. Montgomery No. 27976, 2018-Ohio-5000, ¶ 13. "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553 and *Terry v. Ohio*, 392 U.S. 1, 16 and 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Mendenhall*, the Supreme Court listed several factors that might indicate a seizure, including the display of a weapon by an officer, physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be

compelled, and blocking the citizen's path, among others. *Mendenhall* at 54. "The mere presence of multiple officers does not necessarily establish a seizure." *State v. Thomas*, 2d Dist. Montgomery No. 27588, 2017-Ohio-8606, ¶ 12.

{¶ 17} During investigatory detentions, "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot[.]" (Citations omitted.) *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10, citing *Terry*. Therefore, investigatory detentions do not violate the Fourth Amendment "as long as the police have a reasonable, articulable suspicion of criminal activity." *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 22, citing *Taylor* at 748-749, citing *Terry* at 21. "The determination whether an officer had reasonable suspicion to conduct a *Terry* stop must be based on the totality of circumstances 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622,126 N.E.3d 1132, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991). "An assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.' " *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 18} "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L.Ed.2d 570 (2000), citing *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357

(1979). However, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," and, thus, a stop occurring in a high crime area is a relevant contextual consideration in a *Terry* analysis. *Id.*, citing *Adams v. Williams,* 407 U.S. 143, 144, 147-148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Moreover, "evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.*, citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Florida v. Rodriguez,* 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam)*; United States v. Sokolow,* 490 U.S. 1, 8-9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "Unprovoked flight upon seeing police officers is a relevant consideration in determining whether the totality of the facts and circumstances are sufficiently suspicious to justify a *Terry* stop." *State v. Jordan,* 2d Dist. Clark No. 2005-CA-4, 2006-Ohio-1813, ¶ 22, citing *Wardlow.* "While such a factor is not necessarily indicative of criminal behavior, and can be consistent with innocent conduct, *Terry* recognized that officers may briefly detain individuals to resolve ambiguity in their conduct." *Id.* "Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Wardlow* at 124-125. Thus, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.*, citing *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**{¶ 19}** Unlike investigatory detentions, a seizure that is the equivalent of an arrest

is constitutionally permissible "only if the police have probable cause to arrest a person for a crime." *State v. Retherford*, 93 Ohio App.3d 586, 595, 639 N.E.2d 498 (2d Dist.1994), citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "A seizure is equivalent to an arrest when (1) there is an intent to arrest; (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested." *Taylor* at 749. "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime." *State v. Adams*, 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7, citing *State v. Timson*, 38 Ohio St.2d 122, 311 N.E.2d 16 (1974).

{¶ 20} Whether a law enforcement officer possessed probable cause or reasonable suspicion to detain an individual must be examined in light of the totality of the circumstances viewed from the standpoint of an objectively reasonable police officer. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991); *State v. Short*, 2d Dist. Montgomery No. 27712, 2018-Ohio-3202, ¶ 19-20; *State v. Cromes*, 3d Dist. Shelby No. 17-06-07, 2006-Ohio-6924, ¶ 38, citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "This 'typically requires [a showing] that the officer making the stop [or arrest] was [personally] aware of sufficient facts to justify it[.]'" *State v. Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 9 (2d Dist.), quoting *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999).

{¶ 21} It is worth noting that, at Thornton's motion to suppress hearing, the "stay put" order was the subject of debate. The trial court relied upon the "stay put" order as the

basis for its reasoning that the encounter between the police and Thornton constituted an investigatory detention without reasonable articulable suspicion even before Thornton fled. However, upon our review of the body-camera video, the order to "stay put" was not audible on the video, and the trial court even acknowledged that, while Officer Harris testified that a "stay put" order was given, the audio portion of the video from the body camera was not as clear.

{¶ 22} The State argues that the police had reasonable and articulable suspicion for the purpose of a *Terry* stop when the officers initially approached, announced themselves, shined their flashlights, and said "stay put." The State argues that the police approached during dark hours, knew the area to be a high-crime area where several gun and drug arrests had previously been made, heard loud music, and observed open containers as they approached the three men standing near a parked truck. The State further argues that the officers believed that there was the potential for a citation to be issued pursuant to R.C. 4301.62(B)(3), which prohibits any person from having an opened container of beer or intoxicating liquor in the person's possession in any public place; thus, the officers would have been permitted to detain Thornton to issue a citation but did not have the opportunity because Thornton fled.

{¶ 23} In rebuttal, Thornton argues that he was seized in violation of his Fourth Amendment rights when officers approached as group while spread out in a line, shined their flashlights, announced themselves as "Dayton Police," and said "stay put." Thornton argues that the police did not have reasonable articulable suspicion to justify a *Terry* stop at that point in time. We disagree.

{¶ 24} Thornton was not only in an area of high crime, but the officers had reasonable articulable suspicion that criminal activity was afoot when they observed open containers of alcohol. It was in this context that the officers decided to investigate the three men standing near the parked truck, and both officers testified that their initial plan was merely to speak to them. When viewed through the eyes of the officers and taking into consideration their training and experience, we conclude that, under the totality of the circumstances, the officers were permitted to detain Thornton briefly to resolve ambiguity in his conduct; they were justified in suspecting that Thornton was involved in criminal activity and, therefore, in investigating further. The high-crime nature of the area, combined with the location and time of the encounter, the loud music, and the open containers, gave the officers reasonable suspicion of criminal activity to justify the initial *Terry* stop.

{¶ 25} The State also argues that, even if there was no reasonable articulable suspicion that criminal activity was afoot to justify the initial *Terry* stop, Thornton was never actually seized in violation of his Fourth Amendment rights because, when the officers approached, he fled almost immediately after they identified themselves, ignored the order to "stay put," and was not physically seized by police until after he had fled and discarded the firearm that he was holding. Of note, too, Thornton stated to the officers later while in a police cruiser that he had not known who was approaching and that he had not heard the persons identify themselves as "Dayton Police." Additionally, the State argues that a person's conduct during an encounter, including fleeing, can independently give police reasonable suspicion to engage in an investigatory detention. The State

argues that, considering the totality of these circumstances, the police had additional reasonable articulable suspicion to justify a *Terry* stop of Thornton when he fled while holding a firearm. We agree.

**{¶ 26}** A person is "seized within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446. U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "Absent the use of physical force, a seizure requires both a 'show of authority' from law enforcement and 'submission to [that] assertion of authority' by the person at whom it is directed." *United States v. Garrette,* N.D. Florida No. 3:17cr022/MCR, 2017 WL 3337258 (Aug. 4, 2017). Submission requires that the person comply with the directives of law enforcement. The failure to submit to the instructions means there is no seizure, merely an attempted seizure, which is beyond the scope of the Fourth Amendment. *Brendlin v. California,* 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

**{¶ 27}** In sustaining Thornton's motion to suppress, the trial court relied on the reasoning in *State v. Sumlin*, 2d Dist. Montgomery No. 23144, 2009-Ohio-2185, in concluding that Thornton's actions were not sufficient to give rise to a reasonable articulable suspicion that criminal activity was afoot, and, thus, the stop of Thornton was improper. In *Sumlin*, a police officer came upon Sumlin in a paved parking area behind an apartment building. *Id.* at ¶ 4. The officer approached Sumlin and said, "don't move." *Id.* at ¶ 19. In response, Sumlin backed away a few feet, but did not flee, and was subsequently seized. *Id.* at ¶ 22. We explained that, upon seeing the police, Sumlin

backed up, while still facing the police, from a point where he was in physical contact with a car to another point where he was in physical contact with the same car; that Sumlin was never observed running from the police; and that Sumlin was not seen to have thrown a carried object in reaction to seeing a police officer. *Id.* at ¶ 49. We determined that Sumlin's behavior did not imply an intent to evade police pursuit in the same manner that a man seen running from the location of a police cruiser would imply. *Id.* Finally, we concluded that "the action of simply backing away, slowly, over a short distance, from two police officers exiting a police cruiser, in a high crime neighborhood, with one's hands behind one's back, is not sufficient to give rise to a reasonable, articulable suspicion that criminal activity is afoot," as required for a *Terry* stop, and, thus, the stop in *Sumlin* was improper. *Id.* at ¶ 50.

{¶ 28} The facts in *Sumlin* are distinguishable from the facts in this case. Unlike the defendant in *Sumlin*, Thornton, upon seeing people, immediately turned, ran, and suddenly threw a carried object shortly after running. Thornton did not face the police and simply back away over a short distance with his hands behind his back in defiance of a police order. Thus, we conclude that the trial court inappropriately applied the reasoning in *Sumlin* to find that Thornton's actions were not sufficient to give rise to a reasonable articulable suspicion that he may have been engaging in criminal activity.

{¶ 29} We find the circumstances in *State v. Roberts* to be analogous to the facts in this case. *State v. Roberts*, 2d Dist. Clark No. 2015-CA-104, 2016-Ohio-7327. In *Roberts*, a police officer observed Roberts driving a green pick-up truck, recognized Roberts, and knew that Roberts's driver's license had been suspended six to twelve

months earlier. *Id*. at ¶ 3. The police officer pulled behind Roberts, activated his cruiser's overhead lights, and initiated a traffic stop. *Id*. In response, Roberts exited his own vehicle and fled. *Id*. During an ensuing foot chase, Roberts threw a firearm to the ground. *Id*. The police ultimately caught Roberts and recovered the firearm. *Id*. As a result of the foregoing incident, Roberts was charged with having a weapon while under disability, among other charges. *Id*. Roberts filed a motion to suppress, arguing that the traffic stop had been unlawful because the officer lacked reason to believe that Roberts's license remained suspended when the officer initiated the traffic stop. *Id*. at ¶ 5.

{¶ 30} In *Roberts*, we concluded that Roberts had not been seized at the point at which he possessed the firearm and fled from the police. *Id*. at ¶ 8. We explained that, although Roberts stopped his car, he did not submit to the officer's show of authority and, instead, exited his vehicle and continued his flight from the officer on foot. *Id*. We concluded that, even if the officer's traffic stop of Roberts had been without justification, Roberts was not seized until after he discarded his firearm. *Id*.

{¶ 31} In this case, although several officers were present and approached Thornton and the other two men, the mere presence of multiple officers did not necessarily establish a seizure, and, here, the officers did nothing to engage in physical force prior to Thornton's flight. As the officers approached, they identified themselves, shined flashlights, and said "stay put." The officers testified that they only intended to talk to the three men but were unable to talk to Thornton because he fled immediately. The events of this encounter took place over a matter of seconds. The body-camera videos revealed that the officers approached the three men on foot but were not in the physical

proximity of the men when Thornton turned and ran before the police could effectuate any seizure. At that point in time, the police had done nothing more than attempt to approach Thornton. There was no physical force by the police before Thornton fled. The officers never brandished their weapons or otherwise threatened Thornton. The officers never touched Thornton or blocked his path.

{¶ 32} Considering our reasoning in *Roberts*, even if we were to conclude that initially the officers lacked a sufficient basis to make an investigative stop, Thornton chose to ignore the order to "stay put," did not submit to the officers' show of authority, and had not been seized when he proceeded to flee on foot and discard the firearm. Thornton's failure to submit to the officers' instructions meant that there was no seizure, merely an attempted seizure, which is beyond the scope of the Fourth Amendment. Moreover, at the point at which Thornton engaged in headlong flight, was observed holding a firearm, and then discarded the firearm, the police had additional facts in the totality of the circumstances to cause additional reasonable articulable suspicion to justify a *Terry* stop of Thornton, and, like Roberts, Thornton was not seized until after he fled and discarded the firearm. As a result, Thornton was not seized by the police in violation of his Fourth Amendment rights.

{¶ 33} In *Roberts*, 2d Dist. Clark No. 2015-CA-104, 2016-Ohio-7327, we also noted that, when a defendant abandons property, the act of abandonment negates any Fourth Amendment expectation of privacy, meaning that suppression is not required even if the act of abandonment follows an attempted unlawful stop. *Id.* at ¶ 7. "Abandonment" of property in the present context primarily involves a question of intent, which may be

inferred. *State v. Freeman,* 64 Ohio St.2d 291, 297, 414 N.E.2d 1044 (1980). " 'The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' " (Citations omitted.) *Id.* The legal effect of abandonment is to deprive a defendant of standing to challenge the admissibility of the evidence he abandoned. *Id.* at 298. In other words, if a defendant abandoned a firearm while being chased, the weapon would not be subject to suppression even if the police officer lacked lawful authority to seize him. *Robert*s at ¶ 10. In this case, like Roberts, Thornton "abandoned" the firearm in his possession when he threw it to the ground while being pursued by police, thereby relinquishing any reasonable expectation of privacy in it.

{¶ 34} Because the police officers had reasonable suspicion to justify the initial *Terry* stop of Thornton, and because Thornton, after failing to submit to any show of authority, was not seized until after he fled while holding and then discarding a firearm, thereby establishing additional facts giving rise to reasonable articulable suspicion of criminal activity for a *Terry* stop, Thornton was not seized by the police in violation of his Fourth Amendment rights. The State's sole assignment of error is sustained.

## III.    Conclusion

{¶ 35} Having sustained the State's assignment of error, the judgment of the trial court is reversed.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.