[Cite as *State v. Adams*, 2024-Ohio-174.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29855 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 02092 |
| | : | |
| JOHN ADAMS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 19, 2024

. . . . . . . . . . .

ARVIN S. MILLER, Attorney for Appellant

MATHIAS H. HECK, JR., by LUCAS T. CHRISTENSEN, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} John Adams appeals from his conviction on one count of possession of drugs following a no contest plea; he argues that the trial court erred in overruling his motion to suppress. For the following reasons, we affirm the judgment of the trial court.

**Facts and Procedural History**

{¶ 2} Following a citizen report that a man was passed out in a running motor

vehicle at the edge of a driveway, medics and law enforcement officers responded and found Adams slumped over the steering wheel of his vehicle near the end of his long driveway, outside of a gate and close to the roadway, with his vehicle running and in drive. Medics were able to awaken Adams with little medical intervention, and he refused further care or treatment. Suspecting Adams was under the influence, law enforcement officers ordered him out of the vehicle and observed heroin on the console in plain view.

{¶ 3} Adams was subsequently indicted on one count of possession of heroin. He filed a motion to suppress, and the court conducted an evidentiary hearing; the court overruled the motion. Adams then entered a no contest plea to the single count in the indictment, was found guilty, and was placed on community control sanctions.

## Assignment of Error and Analysis

{¶ 4} In his sole assignment of error, Adams argues that the trial court erred in overruling his motion to suppress because any emergency that responding officers encountered ended when Adams was awakened, refused medical treatment, and medics left the scene. Adams asserts that he was illegally detained without reasonable suspicion that he was armed and that the officers observed the heroin in his vehicle only because he was wrongfully removed from his vehicle. According to Adams, the trial court's factual findings were not consistent with the testimony of the two police officers and the body camera evidence presented by the State. Adams argues that the body camera video clearly showed that the officer only observed the alleged contraband after Adams was removed from the vehicle and after Officer Paul Land had entered the vehicle and reached toward the center console.

{¶ 5} The State responds that the evidence discovered by the officers was "in plain view during a lawful welfare check, which became a lawful investigatory stop." According to the State, even if the community caretaking function ends, a police-citizen interaction may change and become investigatory. The State acknowledges that a responding officer, Land, observed what he recognized as drugs as Adams was getting out of the truck. However, according to the State, responding officers had a reasonable, articulable suspicion that Adams had committed the offense of operating a motor vehicle while under the influence, and therefore they continued to investigate. The State argues that Land was lawfully present pursuant to the community caretaking function when he observed the suspected drugs, regardless of whether the community caretaking aspect of the situation had been resolved by that time.

{¶ 6} When addressing a motion to suppress, the trial court assumes the role of the trier of fact and, as such, is in the best position to resolve conflicts in the evidence and determine the credibility of the witnesses and the weight to be given to their testimony. *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (1994). In reviewing a suppression decision, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *Id.* Accepting those facts as true, we must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

{¶ 7} "The Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, protect individuals from unreasonable searches and

seizures conducted by police officers." (Citations omitted.)   *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶ 12. "The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest." *State v. Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, ¶ 15 (2d Dist.), citing *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.).

**{¶ 8}** "Searches and seizures conducted without a warrant are per se unreasonable absent a few, well recognized exceptions."   (Citations omitted.)   *State v. McCarthy*, 2022-Ohio-4738, 203 N.E.3d 912, ¶ 10 (2d Dist.). " 'One such exception is the community caretaking/emergency-aid exception, which is grounded in interests of public safety.' " *Id.*, citing *State v. Glowney*, 2d Dist. Montgomery Nos. 27896, 27897, 2019-Ohio-3390, ¶ 34.

**{¶ 9}** Under the community-caretaking/emergency-aid exception, a law enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury may conduct a community caretaking/emergency-aid stop.   *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 26.   "Community caretaking functions are 'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *State v. Warnick*, 2d Dist. Miami No. 2019-CA-14, 2020-Ohio-4240, ¶ 21, quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).   "Accordingly, * * * police officers are not required to possess reasonable articulable suspicion of criminal activity when exercising community caretaking functions/emergency aid."   (Citations omitted.)   *State v. Klase*, 2019-Ohio-

3392, 131 N.E.3d 1054, ¶ 17 (2d Dist.); *see also McCarthy* at ¶ 11.

{¶ 10} In contrast, pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in an investigatory stop, police officers may temporarily detain individuals to investigate possible criminal activity if the officers possess a reasonable, articulable suspicion that criminal activity may be afoot. *Weisgarber,* 2017-Ohio-8764, 88 N.E.3d 1037, at ¶ 17, citing *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 17. A *Terry* stop is "more intrusive than a consensual encounter but less intrusive than a formal custodial arrest." *State v. Thornton*, 2023-Ohio-1404, 213 N.E.3d 808, ¶ 16 (2d Dist.), citing *State v. Taylor,* 106 Ohio App.3d 741, 748, 667 N.E.2d 60 (2d Dist.1995).

{¶ 11} "Reasonable suspicion entails some minimal level of objective justification * * *[,] something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-57, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27. "We determine the existence of reasonable suspicion of criminal activity by evaluating the totality of the circumstances, considering those circumstances 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 13 (2d Dist.), quoting *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). While we defer to the trial court's factual findings supported by the record, "[w]hether articulable suspicion exists for the officer's conduct is a question of law and we review the trial court's action 'de novo'

or independently." *State v. Van Hoose*, 2d Dist. Montgomery No. 18287, 2000 WL 1838764, \*3 (Dec. 15, 2000), citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

{¶ 12} It "is well-established that, during the course of a lawful traffic stop, law enforcement officers are authorized to remove the occupants from the vehicle. *State v. Nelson*, 2d Dist. Montgomery No. 22718, 2009-Ohio-2546, ¶ 41, citing *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) and *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In other words, "the ordering of a motorist out of his vehicle during a traffic stop [is] merely an incident to the stop, requiring no additional justification." *State v. Sarno,* 2d Dist. Montgomery No. 25751, 2013-Ohio-5058, ¶ 20.

{¶ 13} Finally, the plain view doctrine is another exception to the search warrant requirement. *State v. Boyd*, 2d Dist. Montgomery No. 28490, 2020-Ohio-125, ¶ 16, citing *State v. Hunter*, 2d Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 31, citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "Under the plain-view exception, 'police may seize an article when its incriminating nature is immediately apparent to an officer who comes in contact with the item through lawful activity.' " *Id.,* citing *State v. Thompson*, 2d Dist. Montgomery No. 25658, 2013-Ohio-4825, ¶ 13, quoting *State v. Pounds*, 2d Dist. Montgomery No. 21257, 2006-Ohio-3040, ¶ 19. "The police officer need not be absolutely certain that the item seen in plain view is contraband or evidence of a crime. It is sufficient if probable cause exists to associate the item with criminal activity." *Id.*, citing *Pounds* at ¶ 19.

{¶ 14} Once an officer sees contraband in plain view inside a vehicle, he or she then has probable cause to believe the vehicle contains other items of contraband and may conduct a warrantless search of the vehicle pursuant to the automobile exception to the search warrant requirement. *Id.* at ¶ 17, citing *Thompson* at ¶ 13, citing *Pounds* at ¶ 21. "Under the automobile exception, police may warrantlessly search a vehicle that they have probable cause to believe contains contraband." *Id.*, citing *State v. Moore*, 90 Ohio St.3d 47, 51, 734 N.E.2d 804 (2000). "The scope of the search extends to anywhere in the vehicle that contraband might be hidden." *Id.*, citing *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). This includes a closed container if there is probable cause to believe it contains evidence related to the crime under investigation. *Id.*, citing *State v. Roberts*, 2d Dist. Montgomery No. 21221, 2006-Ohio-3042, ¶ 18.

{¶ 15} At the suppression hearing, Adams's attorney asserted that the sole issue before the court was the search of Adams's vehicle. Officer Andrew Albrinck of the Moraine Police Department testified that on May 8, 2022, he was dispatched to a residence on Pinnacle Road on the report of a man, later identified as Adams, passed out behind the wheel of a gray Nissan pickup in the driveway of his own residence. The original 911 call was placed by passersby who noticed Adams slumped over the steering wheel on their way to get food and then again observed Adams in the same position in the same area of the driveway on their return. According to Albrinck, the callers reported that the pickup "wasn't necessarily all the way up in the driveway. It was closer to the roadside."

{¶ 16} The encounter between Moraine Police Officers and Adams was captured on body camera video, which was admitted into evidence at the suppression hearing. Albrinck, who had ten years of law enforcement experience, testified that overdose calls are common in Moraine. Albrinck arrived on the scene less than two minutes after medics, who were first at the scene; when he arrived, medics were attempting to awaken Adams, who was "just slumped right over the steering wheel." The pickup truck was running and in drive, with Adams's foot on the brake enough to keep him from rolling forward. Medical personnel put the vehicle in park and removed the keys for safety.

{¶ 17} Once he was conscious, Adams refused additional medical treatment. Adams appeared to be inebriated and his speech was slurred. Albrinck attempted to ascertain Adams's identity and learn if any medical condition had caused his lack of consciousness or his condition. Albrinck also asked Adams if there was anything in the vehicle that would harm him, and Adams "neglected to answer the question," so Albrinck ordered him out of the vehicle. Adams initially refused to exit the vehicle and began to "fiddle around" to try to turn off the ignition, despite the fact that medics had already done so. As Adams then exited the pickup, Albrinck was advised by Officer Land, who was standing on the passenger side of the vehicle, that he observed drugs "sitting directly on top of the center console that were in plain view." Albrinck had observed a white substance, "definitely something that we'd be used to seeing" in the officers' experience with illegal drugs.

{¶ 18} Albrinck then took Adams into custody. Land completed a search of the vehicle due to observing suspected drugs in plain view, while Albrinck administered field

sobriety tests to Adams on the suspicion that Adams had operated the vehicle while impaired. After the investigation, the officers issued Adams a citation for having physical control of the vehicle while under the influence.

{¶ 19} Officer Land testified, consistently with Albrinck, that he was dispatched to a Pinnacle Road address around 8:13 p.m. on the report of an unconscious male in the driver's seat of a vehicle at the edge of the roadway. Like Albrinck, Land had over ten years' of law enforcement experience, and he had had a previous encounter with Adams involving drug possession. Land approached the front passenger side of the pickup truck while Albrinck spoke to Adams from the driver's side of the truck. When Adams lifted his right elbow from the center console while speaking to Albrinck, Land observed a small baggie in plain view containing what he suspected were illegal drugs based upon his training and experience. Land stated that he immediately notified Albrinck of the presence of suspected drugs.

{¶ 20} After Adams exited the pickup truck, Land searched the vehicle, believing that more illegal drugs could be present therein. Land testified that, in a cup holder in the center console, he found a cut straw with residue on it, which he knew to be commonly used for snorting illegal drugs, and another small baggie of suspected illegal narcotics in the cigarette case. Finally, after lifting an armrest, Land found a digital scale commonly used with illegal narcotics and a small baggie of suspected marijuana inside of the armrest.

{¶ 21} After hearing this evidence and reviewing the body camera video, the trial court overruled Adams's motion to suppress and found that, as Land had stood at the

passenger door while Adams spoke to Albrinck, Land saw in plain view a baggie of suspected narcotics on the console of the vehicle when Adams moved his arm. The court further found that what began as a welfare check "turned into a[n] investigatory scenario." The court found that, upon speaking with Adams to ascertain the nature of his condition, narcotics were then found in plain view, and "the search was then subject to a probable cause search." The court concluded that the police officers very specifically identified their articulable suspicion upon arriving at the scene and, once they had spoken to Adams, who seemed incoherent, and in trying to ascertain what was going on, the officer saw in plain view what appeared to be narcotics based on their training and experience.

{¶ 22} The body camera video is consistent with both officers' testimony. While responding to a report of an unconscious person in a running vehicle near a roadway, Albrinck and Land approached Adams's vehicle in the interest of emergency aid and public safety. After Adams refused medical treatment, medics turned the scene over to the officers and departed. Contrary to Adams's argument, he was not, at this point, entitled to end his encounter with the officers, as the officers had reasonable, articulable suspicion to continue their encounter with him.

{¶ 23} Adams's demeanor, slurred speech, slow responses, the location of his vehicle so close to passing traffic, and his condition upon the arrivals of medics and officers reasonably suggested to Officers Albrinck and Land that Adams was under the influence. Under these circumstances, the officers had reasonable articulable suspicion to continue their investigation and were permitted to order Adams out of the vehicle.

Adams's assertion that he was illegally detained by the officers is belied by the evidence, and reasonable suspicion that he was armed was not required to continue the encounter. While lawfully positioned on the passenger side of the truck, Land observed what, in his experience, appeared to be an illegal narcotic on the console inside the vehicle, and he informed Albrinck. The drugs were visible in the video on the console after Adams got out of the vehicle, thereby justifying the further search of the truck. Thus, there was no violation of Adams's Fourth Amendment rights in his interaction with the officers.

{¶ 24} For the foregoing reasons, the trial court did not err in overruling Adams's motion to suppress. His assignment of error is overruled.

{¶ 25} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.