[Cite as *State v. Barber*, 2025-Ohio-1193.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                              |     |                 |                        |
| ---------------------------- | --- | --------------- | ---------------------- |
| STATE OF OHIO,               | :   | APPEAL NOS.     | C-240239               |
|                              |     |                 | C-240240               |
| Plaintiff-Appellee,          | :   | TRIAL NOS.      | B-2304389              |
|                              |     |                 | B-2400076              |
| vs.                          | :   |                 |                        |
|                              |     |                 |                        |
| VASHAWN BARBER,              | :   |                 |                        |
|                              |     |                 | *O P I N I O N*        |
| Defendant-Appellant.         | :   |                 |                        |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Appellant Discharged in Part and
                               Appeal Dismissed in Part in C-240239;
                               Affirmed in C-240240

Date of Judgment Entry on Appeal: April 4, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Norbert Wessels*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**Bock, Presiding Judge.**

{¶1} A juvenile court adjudicated 16-year-old Vashawn Barber delinquent for violating Ohio's statute regulating carrying a concealed weapon ("CCW"). Based on that adjudication, when Barber became an adult, Ohio law restricted his ability to carry a concealed weapon and to have a weapon accessible to him while in a vehicle.

{¶2} On his 21st birthday, Barber purchased a firearm. Months later, in 2023, the State charged Barber with violating R.C. 2923.12(A)(2), the CCW statute, and R.C. 2923.16(B), improperly handling firearms in a motor vehicle ("improper handling"). In 2024, while Barber's 2023 case was pending, the State again charged Barber with violating the CCW statute. Barber moved to dismiss both cases. After the trial court denied his motions, Barber pleaded no-contest, and the trial court convicted him of all charges. Barber asserts that the statutes violate his right to bear arms under the Second Amendment to the United States Constitution.

{¶3} In some contexts, and as to some individuals, there exists a historical tradition of the government restricting people from carrying concealed weapons. But here, we hold that R.C. 2923.12(A)(2) and 2923.16(B), as applied to Barber, do not comport with the nation's historical tradition of firearms regulation. Barber's juvenile adjudication for a CCW violation does not support the State's indefinite determination that he is dangerous. We sustain Barber's first and second assignments of error and reverse his convictions in the appeal numbered C-240239.

{¶4} Barber did not challenge below the provision of Ohio law preventing him from possessing a concealed weapon while under indictment. And Barber failed to develop a plain-error argument related to that conviction. Therefore, we affirm Barber's conviction in the appeal numbered C-240240.

### *I. FACTUAL AND PROCEDURAL HISTORY*

**{¶5}** When he was 16 years old, a juvenile court adjudicated Barber delinquent for carrying a concealed weapon, which constituted an act that, if committed by an adult, would have been a felony.

**{¶6}** About five years later, when he turned 21, Barber purchased a firearm—an act permitted by both Ohio and federal law. In September 2023, law enforcement officers approached a parked vehicle in which Barber and two other individuals were seated. Barber informed the officers that he had a handgun in the car. The officers arrested Barber and charged him with improper handling and CCW.

**{¶7}** In January 2024, while his 2023 case was pending, officers again found Barber with a concealed weapon and again charged him with CCW.

**{¶8}** Barber moved to dismiss the 2023 charges, asserting that the charges against him violated his rights under the Second and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 4 of the Ohio Constitution. In support, Barber cited *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022). Barber argued that, as applied to him, both the CCW and improper-handling statutes violated his constitutional rights. Further, he asserted that Ohio's definition of "qualifying adult" under R.C. 2923.111 and 2923.125(D)(1) violated his right to bear arms in self-defense, "by deeming Mr. Barber a not qualifying person based solely on a juvenile adjudication." Barber additionally argued that the improper-handling statute was facially unconstitutional under the Second Amendment.

**{¶9}** The State's response acknowledged that *Bruen* imposed on it the burden to justify the challenged statutes. It cited various historical sources to support the regulations. Though Barber had not yet moved to dismiss the 2024 charge, the State filed a memorandum in opposition in that case as well.

{¶10} In April 2024, at a hearing on Barber's motion, the trial court explained that the parties had discussed the motion in chambers. The trial court orally overruled the motion. Though the trial court's entry indicated that it had read into the record "[s]pecific findings of fact and conclusions of law," the trial court had made no findings on the record.

{¶11} Barber later filed a motion to dismiss the 2024 charges. The motion was nearly identical to the motion filed in the 2023 case. It did not address or challenge the fact that in addition to his juvenile adjudication, Ohio law prevented him from being a "qualifying adult" due to his being under indictment for a felony offense. *See* R.C. 2932.111(A)(2)(c) and 2923.125(D)(1)(d). The trial court denied Barber's motion to dismiss his 2024 charges.

{¶12} Barber withdrew his not guilty pleas and pleaded no contest in both cases. The trial court found Barber guilty and sentenced him to community control on all charges. Barber appealed his convictions, and we consolidated the cases for appeal.

## II. RELEVANT LAW

{¶13} On appeal, Barber asserts four assignments of error: (1) the trial court erred in denying his motion to dismiss the improper-handling charge in the 2023 case, (2) the trial court erred in denying his motion to dismiss the CCW charge in the 2023 case, (3) the trial court erred in denying his motion to dismiss the CCW charge in the 2024 case, and (4) the trial court erred in failing to merge the CCW and improper-handling convictions in the 2023 case for sentencing purposes.

{¶14} Three of Barber's assignments of error require us to determine whether Ohio's statutes regulating firearms violate the Second Amendment to the United States Constitution, both facially and as-applied to Barber.

### A. The Second Amendment

**{¶15}** The Second Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II; *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

**{¶16}** In *Bruen*, 597 U.S. at 22, the Supreme Court of the United States established a two-step test for courts to employ when considering Second Amendment challenges to statutes regulating firearms. *See State v. Storms*, 2024-Ohio-1954, ¶ 12 (1st Dist.).

**{¶17}** Courts first must ask whether the "Second Amendment's plain text covers an individual's conduct." *Bruen* at 24. If so, the "Constitution presumptively protects that conduct." *Id.*

**{¶18}** Under step two, the State bears the burden of justifying the challenged law by affirmatively "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* The State must carry its burden by compiling a record of historically permissible firearms laws "relevantly similar" to the firearm regulation being challenged. *Id.* at 29. The State bears this burden and courts need not search for evidence on behalf of the State. *Id.* at 25, fn. 6; *see Storms* at ¶ 17.

### B.     *Rahimi and Bruen*

**{¶19}** The *Bruen* Court explained that, in analyzing the constitutionality of firearms laws under the Second Amendment, courts should focus on whether the state's historical evidence is "relevantly similar" to the challenged law, and in doing so, courts are called on to engage in "analogical reasoning." *Bruen*, 597 U.S. at 30. The *Bruen* Court assured that its test was "neither a regulatory straightjacket nor a regulatory blank check." *Id.* The *Bruen* Court cautioned that "courts should not

'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.*, quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021). But the Court was equally explicit that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

**{¶20}** In engaging in this analogical reasoning, the *Bruen* Court instructed courts to consider two metrics: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." (Emphasis added.) *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '"central"' considerations when engaging in an analogical inquiry." *Id.*, quoting *McDonald*, 561 U.S. at 767, quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).

**{¶21}** After the trial court sentenced Barber, but during the pendency of this appeal, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024). Both Barber and the State discussed *Rahimi* in their briefing to this court.

**{¶22}** The *Rahimi* Court applied *Bruen*'s test to the federal prohibition on firearm possession by those subject to civil restraining orders. In *Rahimi,* the Court pushed back on what it viewed as some courts' overly strict application of *Bruen* and emphasized that the Second Amendment is not a "law trapped in amber." *Id.* at 691. The Court reaffirmed the government's burden under *Bruen* of presenting historical analogues that are "relevantly similar" to the challenged law, "'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692, quoting *Bruen*, 597 U.S. at 29. But *Rahimi* clarified that in engaging in this analysis,

courts should ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* The *Rahimi* Court confirmed, "Why and how the regulation burdens the right are central to the Second Amendment inquiry." *Id.* Like *Bruen*'s focus on "comparable burdens" and "comparable justifications," *Rahimi* directed courts to look at whether the historical and challenged firearms laws impose "similar restrictions for similar reasons." *Id.*

### C.    Relevant Ohio firearm-regulation statutes

**{¶23}** In the 2023 case, the State charged Barber with improper handling in violation of R.C. 2923.16(B), which provides, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." The State also charged him with CCW in violation of R.C. 2923.12(A)(2), which provides, "No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, . . . (2) A handgun other than a dangerous ordnance." In the 2024 case, the State again charged Barber with CCW in violation of R.C. 2923.12(A)(2). While these statutory texts are straightforward, recent developments in Ohio's firearm statutes reveal how these laws function to regulate firearms.

1.    Ohio law foregoes CCW licensing requirements for "qualifying adults"

**{¶24}** R.C. 2923.12(A)(2)'s prohibition on carrying a concealed weapon "does not apply to any person who has been issued a concealed handgun license that is valid at the time of the alleged carrying or possession of a handgun." R.C. 2923.12(C)(2). Similarly, R.C. 2923.16(B)'s prohibition on having a loaded firearm in a vehicle that the driver or passenger can access without leaving the vehicle "do[es] not apply to a person" who "has been issued a concealed handgun license that is valid at the time in question." R.C. 2923.16(F)(5)(a).

{¶25} In June 2022, Ohio's General Assembly enacted R.C. 2923.111, which eliminated the requirement for "qualifying adult[s]" to obtain a license to carry a concealed handgun, other than "restricted firearm[s]." R.C. 2923.111(B)(1). The statute allows a "qualifying adult" to carry a concealed handgun "anywhere in this state in which a person who has been issued a concealed handgun license may carry a concealed handgun." R.C. 2923.111(B)(2). And for purposes of the CCW statute and all other Ohio statutes referring to a concealed handgun license, a "qualifying adult" carrying a concealed firearm "shall be deemed to have been issued a valid concealed handgun license." R.C. 2923.111(C)(1). Thus, when a statutory provision's application to a person depends on whether that person has a concealed-handgun license, "the provision shall be applied to a person who is a qualifying adult in the same manner as if the person was a concealed handgun licensee." R.C. 2923.111(C)(1)(d).

{¶26} As a result of R.C. 2923.111, a "qualifying adult" is deemed to possess a valid concealed handgun license and is not subject to prosecution for a violation of R.C. 2923.12(A)(2) or 2923.16(B). Therefore, if Barber were a qualifying adult, his conduct leading to his CCW and improper-handling charges would not be criminal.

2. The State excludes categories of people from being "qualifying adults"

{¶27} A "qualifying adult" is a person 21 years old or older who is not prohibited from having a firearm under a federal statute or R.C. 2923.13, and who satisfies various criteria under R.C. 2923.125(D)(1) ("Application for License to Carry Concealed Handgun"). R.C. 2923.111(A)(2)(a)-(c).

{¶28} Relevant to Barber's 2023 charges, R.C. 2923.125(D)(1)(e) requires a sheriff to issue a concealed-carry license to an applicant, unless the applicant has been "adjudicated a delinquent child for committing an act that if committed by an adult would be a felony." The parties agree that under Ohio law, Barber was not a "qualifying

8

adult" when he was charged in September 2023 because a juvenile court had adjudicated Barber delinquent for acts constituting a felony if committed by an adult.

**{¶29}** And at the time of his 2024 indictment, Barber was not a "qualifying adult" both because of his juvenile adjudication and because he was under indictment in the 2023 case for a felony offense. *See* R.C. 2932.111(A)(2)(c) and 2923.125(D)(1)(d).

### III. *BRUEN'S FIRST STEP: THE SECOND AMENDMENT'S PLAIN TEXT COVERS BARBER'S CONDUCT*

**{¶30}** We review a challenge to a statute's constitutionality de novo. *Storms*, 2024-Ohio-1954, at ¶ 10 (1st Dist.). In his first, second, and third assignments of error, Barber challenges the constitutionality of the CCW and improper-handling statutes, facially and as applied to him. For ease of discussion, we discuss Bruen's first step as it applies to Barber's assignments out of order. We then turn to *Bruen's* second step and individually address each assignment of error, again out of order.

**{¶31}** Under *Bruen*'s first step, a court's analysis is a textual one. Courts must look at the ""normal and ordinary"" meaning of the Second Amendment's language" and ask whether that "plain text" covers the challenger's definition of "to bear arms." *See Storms* at ¶ 24. If so, the Second Amendment presumptively protects the individual's conduct.

**{¶32}** In *Storms*, this Court held that the Second Amendment's text covers the act of carrying a concealed weapon. *Id.* at ¶ 24. We cited *Bruen*, which, relying on *Heller*, reaffirmed that a person's right to "bear arms" included that person's right to carry a firearm "upon the person or in the clothing or in a pocket." *Id.*, quoting *Bruen*, 597 U.S. at 32, quoting *Heller*, 554 U.S. at 584.

**{¶33}** The State does not challenge our holding in *Storms* and concedes that

9

Barber's conduct—carrying a concealed weapon despite not being a qualified adult due to his juvenile adjudication, having a weapon accessible in a vehicle, and carrying a concealed weapon while under felony indictment—was presumptively protected under the Second Amendment. We conclude, as we did in *Storms*, that Barber's carrying a concealed handgun falls squarely within *Heller*'s discussion of the Second Amendment's scope.

**{¶34}** Despite its concession, the State, in its argument under *Bruen*'s second prong, suggests that because it does not prohibit alternative avenues by which Barber might have borne arms—i.e. open carry—that the State's restriction on Barber's ability to legally carry a concealed weapon does not implicate the Second Amendment. We address this argument in detail below. For now, we note that under *Bruen*'s first prong, we are called to consider only the Second Amendment's plain text and the "proposed course of conduct" in which the regulation's challenger engaged or intends to engage. When determining whether such conduct falls under the Second Amendment's plain text, there is no basis for us to consider hypothetical alternative ways the challenger might bear arms.

**{¶35}** We agree with the State that Barber's having an accessible weapon while in a vehicle for the purposes of being armed for self-defense falls within the Second Amendment's plain text. We see nothing under the Second Amendment's plain text or *Heller*'s description of that right suggesting that a person's Second Amendment right to bear arms for self-defense dissipates when entering a vehicle.

**{¶36}** We hold that Barber's conduct—carrying a concealed weapon and having a weapon accessible to him in a vehicle—is conduct covered by the Second Amendment.

### IV. BRUEN'S SECOND STEP

{¶37} Because the Second Amendment covers Barber's conduct, the State bore the burden below of affirmatively establishing that the CCW and improper-handling statutes are "consistent with the Nation's historical tradition of firearm regulations." We continue to *Bruen*'s second step.

### A. Second Assignment of Error

{¶38} Barber's second assignment of error challenges the trial court's denial of his motion to dismiss his 2023 CCW charge. Below and on appeal, the State relies on two primary arguments to justify Barber's CCW charges under *Bruen*'s second step. First, the State points to historical laws regulating the concealed carry of weapons. Second, the State argues that there is a historical tradition of disarming people deemed to be dangerous, such as those convicted of a felony offense, and that this historical tradition permits it to limit Barber's Second Amendment rights.

1. The State's evidence establishes a historical tradition of restricting the carrying of concealed weapons

{¶39} The *Heller* Court observed that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. And although *Bruen* involved a challenge to a ban on openly carrying firearms, it provided an overview of the nation's history of banning carrying concealed weapons. *Bruen*, 597 U.S. at 59. The *Bruen* Court concluded that "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Id.*; *see Nunn v. State*, 1 Ga. 243, 251 (1846) ("[S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, . . . But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with

the Constitution, and void.").

**{¶40}** The State points to *Nunn*, which surveyed several court decisions involving concealed-carry bans' constitutionality. *See Nunn* at 247-250. These courts largely upheld the prohibitions, though the Supreme Court of Kentucky struck down a concealed-carry ban in *Bliss v. Commonwealth*, 12 Ky. 90, 90 (1822).

**{¶41}** We pause to note that the State has cited to no historical analogue contemporaneous with the ratification of the Second Amendment. Instead, its historical record consists of various antebellum laws from the 19th century. *See United States v. Tolmosoff*, 2024 U.S. Dist. LEXIS 66920, *20 (E.D.Cal. Apr. 11, 2024) ("Historians appear to agree that licensing schemes were a post-Civil War phenomenon, largely due to the development of urban centers, professional police forces, and administrative agencies.") As *Bruen* stated, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. . . . The Second Amendment was ratified in 1791; the Fourteenth in 1886." *Bruen* at 34. *Bruen* and *Rahimi* acknowledged an "ongoing scholarly debate" on whether the Second Amendment should be interpreted according to its understanding at the time that the Fourteenth Amendment was ratified or when the Second Amendment was ratified. *Bruen* at 37; *Rahimi*, 602 U.S. at 692, fn. 1. Neither Court decided the issue. *But see Lara v. Commr. Pennsylvania State Police,* 125 F.4th 428, 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that 'meaning is fixed according to the understandings of those who ratified it[.]'"). We need not weigh in on the issue, however, because the CCW laws upon which the State relies are not relevantly similar to Ohio's concealed-carry scheme.

**{¶42}** We acknowledge that the State produced some historical carry-conceal

laws containing wholesale prohibitions on carrying concealed weapons. Usually, however, historical concealed-carry prohibitions "made exceptions for travelers passing through an area while armed." *Spitzer*, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemporary Problems 55, 64 (2017); *see State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (upholding an 1831 statute "prohibiting all persons, except travelers, from wearing or carrying concealed weapons."); *see also State v. Buzzard*, 4 Ark. 18, 18 (1842) ("'[E]very person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.'").

**{¶43}** Moreover, concealed-carry laws often included exceptions for self-defense. The State points to Ohio's first concealed-carry law, passed in 1859, which made it a misdemeanor to "carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon." Act of Mar. 18, 1859, 1859 Ohio Laws at 56-57, § 1. But Ohio's law provided an exception: a person was not criminally liable if "engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family." *Id.* at § 2.

**{¶44}** Assuming, without deciding, that the historical laws cited by the State meets its burden to establish that *how* Ohio's CCW statute burdens Barber's Second Amendment right is "relevantly similar" to our nation's history of firearms regulation, the State next must show that *why* Ohio's CCW statute burdens Barber's Second Amendment right is relevantly similar to historical firearm regulations.

2. The State's historical analogues establish that dangerousness justified

laws restricting one's right to carry a concealed weapon

{¶45} The State's evidence shows that historically, some states prohibited carrying concealed weapons because of the perceived increased danger posed by the practice and the likelihood that those who carried concealed weapons did so with the intent to use them in affirmative acts of violence.

{¶46} In 1813, Louisiana enacted a law making it a misdemeanor "to be 'found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full open view.'" *State v. Chandler*, 5 La.Ann. 489, 489-490 (1850). Addressing the purpose of the law, the Supreme Court of Louisiana explained:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence [sic] of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

*Id.*

{¶47} In 1839, Alabama prohibited any person from carrying concealed firearms, certain knives, and other deadly weapons. *State v. Reid*, 1 Ala. 612, 614 (1840). The section was titled an act "to suppress the evil practice of carrying weapons secretly." *Id.*; *see Spitzer*, 80 Law & Contemporary Problems at 55, 64 (describing "Tennessee's 1837 law, which referred to 'each and every person so degrading himself'

by carrying pistols or other named weapons.").

**{¶48}** These 19th century concealed-carry prohibitions reflect a belief that allowing people to carry concealed weapons was dangerous due to the likelihood that those people concealing weapons would use them to engage in assassinations or other unjustified acts of violence. Given this belief, some states in the 19th century restricted people's ability to legally carry concealed weapons. Nevertheless, several states did not entirely foreclose people from carrying concealed weapons. Rather, they permitted people to carry concealed weapons while traveling or for self-defense purposes. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 656 (D.N.J. 2023) (noting that several states including "Arkansas, Alabama, Indiana, and Kentucky—exempt those traveling or on a journey from the laws concealed carry prohibition."); *see also Suarez v. Paris*, 741 F. Supp. 3d 237, 259 (M.D.Pa. 2024), fn. 22 (same).

**{¶49}** The State argues that because it permitted Barber to openly carry firearms, the State's prohibition against him carrying a concealed weapon does not implicate his right to bear arms under the Second Amendment. Initially, as explained above, we have determined that the plain language of the Second Amendment covers Barber's proposed conduct in this case—carrying a concealed weapon and having a weapon accessible to him in a vehicle. Thus, the Second Amendment presumptively permits Barber's conduct.

**{¶50}** And while the State did not wholly preclude Barber from possessing a firearm, it did restrict the manner and locations in which he may possess a firearm. That the State does not criminalize alternative avenues by which Barber may exercise his Second Amendment rights does not mean that the way in which the State does regulate how Barber bears arms passes constitutional muster.

**{¶51}** Pre-*Bruen*, courts reviewing Second Amendment challenges employed

15

a form of intermediate scrutiny that considered whether the challenged regulation left "open alternate means of exercising the fundamental right to bear arms." *See State v. Campbell*, 2013-Ohio-5612, ¶ 14 (1st Dist.). But the *Bruen* Court unequivocally rejected this approach. *Bruen*, 597 U.S. at 19 ("Despite the popularity of this two-step approach, it is one step too many.").

**{¶52}** That is not to say that the State's permitting Barber to open carry is irrelevant. It is relevant to determining, under *Bruen*'s second step, whether the burden imposed on Barber's Second Amendment right is a "comparable burden" to historical analogues.

**{¶53}** The State frames Ohio's concealed-carry scheme as the State's extension of a privilege to "qualifying adults," rather than a burdening of others' Second Amendment rights. But we have already determined that the Second Amendment's plain text covers Barber's conduct and therefore, the restriction presumptively burdens Barber's right to bear arms. We decline the State's invitation to hold that the licensure requirements a state establishes for a person to carry a concealed weapon are not subject to Second Amendment scrutiny. Indeed, while the *Bruen* Court reviewed a dissimilar licensing scheme, that Court suggested that states' licensure requirements to carry a firearm are subject to Second Amendment scrutiny. *See Bruen* at 12 (discussing New York's "may issue" licensing scheme).

3.    Ohio's restrictions on Barber's Second Amendment right are not for "similar reasons" as historically permissible concealed-carry bans

**{¶54}** In *Rahimi,* the Court instructed courts to consider whether contemporary laws impose "similar restrictions *for similar reasons*." (Emphasis added.) *Rahimi*, 602 U.S. at 692. So, while Ohio's CCW statute may impose "similar restrictions" to historically acceptable concealed-carry laws, *Rahimi* stated that those

restrictions must be imposed for "similar reasons."

**{¶55}** This is where R.C. 2923.111's presumption in favor of concealed carry alters our analysis. The State's historical evidence shows that states regulated one's ability to carry concealed weapons because the act was viewed as "cowardly" and dangerous. But by permitting most Ohio adults to carry concealed weapons, without having to take any steps to obtain a concealed-carry license, it is clear that Ohio has departed from the view that the simple act of carrying a concealed weapon is itself dangerous.

**{¶56}** Instead, Ohio law now restricts the right of only certain categories of people to carry concealed weapons, such as those who have been subject to certain criminal convictions or adjudications, who are under 21 years old, or have been committed to a "mental institution." And in Barber's case, Ohio imposes a burden on his right to bear arms because of Barber's juvenile adjudication. So, while the government may impose restrictions on Barber's Second Amendment rights similar to restrictions imposed in historical laws, Ohio does not do so for "similar reasons." In other words, even if the "how" matches, the "why" does not. The State appears, at least to some extent, to recognize this departure as it spends a substantial amount of its brief justifying Barber's charges by relying on the history of disarming dangerous individuals.

**{¶57}** We recently considered the State's "dangerousness" rationale and the historical sources on which the State relied to support its assertion that it can disarm those deemed to be dangerous. *See State v. Thacker*, 2024-Ohio-5835, ¶ 79 (1st Dist.).[1]

---

[1] The Supreme Court of Ohio recently accepted *Thacker* for review. *See Thacker*, 2024-Ohio-5835 (1st Dist.), *accepted for review*, 2025-Ohio-705, *and held for decision in State v. Striblin*, 2024-Ohio-4713.

In *Thacker*, we addressed a defendant's challenge to a weapons-under-disability ("WUD") charge based on the adult defendant's juvenile adjudication for what would constitute a nonviolent drug felony if committed by an adult. *Id.* at ¶ 4. Though *Thacker* dealt with a categorical prohibition on gun possession rather than a prohibition on carrying a concealed weapon, *Thacker* addressed a substantially similar dangerousness rationale presented by the State. *Id.* at ¶ 79-80. We noted in *Thacker* that "the State need not rely upon this dangerousness framework to justify every regulation." (Emphasis omitted.) *Id.* at ¶ 56. But given that the State's briefing below and on appeal primarily relies on the government's historic power to disarm those deemed to be dangerous, we follow *Thacker*'s analysis here.

**{¶58}** We explained that our Nation's history and tradition "includes a longstanding practice—dating back to before and during the founding era—of legislatures disarming those they determine to be dangerous, at least for a time." *Id.* at ¶ 54. And we noted that a legislature's determination of who is dangerous is subject to judicial scrutiny under the Second Amendment. *Id.* at ¶ 49. After discussing *Bruen* and *Rahimi,* and surveying relevant lower court decisions in their wake, we concluded:

> The constitutionality of a categorical, class-wide disarmament that is predicated upon the 'dangerousness' of the class will generally depend upon (1) whether the class of persons disarmed can reasonably be presumed dangerous with a firearm, and (2) whether the duration of the disarmament is realistically tailored to the danger persons in that class pose.

*Id.* at ¶ 54.

**{¶59}** *Thacker* and the historic evidence presented by the State convince us that the State may prevent dangerous individuals from possessing concealed weapons.

18

But Barber challenged his charges as applied to him. As we explained in *Thacker*, a person may bring an as-applied Second Amendment challenge to a facially valid firearm regulation to establish that the presumption of danger reflected in the regulation does not apply to that person. *Id.* at ¶ 49; *see United States v. Williams*, 113 F.4th 637, 661 (6th Cir. 2024) ("When a disarmament statute doesn't provide an administrative scheme for individualized exceptions, as-applied challenges provide a mechanism for courts to make individualized dangerousness determinations.").

**{¶60}** The issue here is whether the State has established that, based on his juvenile adjudication for what would constitute a CCW violation if committed by an adult, Barber is dangerous, thus allowing the State to restrict his Second Amendment rights. In *Thacker*, we held that the State may not impose "a lifelong presumption of dangerousness upon an individual based solely upon a juvenile delinquency adjudication for conduct that is not inherently violent, in order to restrict his ability to engage in otherwise-protected Second Amendment conduct." *Thacker*, 2024-Ohio-5835, at ¶ 95 (1st Dist.). We held R.C. 2923.13(A)(3) was unconstitutional as applied to Thacker. *Id.* at ¶ 105.

**{¶61}** So too here. Given the juvenile court's focus on rehabilitation, and Barber's successful discharge from the juvenile court system, Barber's adjudication for a nonviolent act—carrying a concealed weapon—is insufficient to sustain the presumption that he is indefinitely dangerous. While improperly carrying a concealed weapon certainly can increase the risk of danger, a technical violation of the CCW statute generally would fail to establish a person's indefinite dangerousness for purposes of the Second Amendment. This is particularly so in the context of a juvenile delinquency adjudication and the rehabilitative nature of juvenile proceedings.

**{¶62}** The State primarily relies on a dangerousness rationale to support the

19

charges against Barber. But the State failed to present anything establishing a historical tradition of restricting one's right to keep and bear arms based on their failing to comply with the firearm regulations themselves.

**{¶63}** We hold that the State failed to carry its burden under the Second Amendment. R.C. 2923.12(A)(2) is unconstitutional, as applied to Barber, based on Barber's juvenile adjudication for conduct that would constitute a CCW violation if he were an adult. We sustain Barber's second assignment of error.

### B. First Assignment of Error

**{¶64}** Barber's first assignment of error asserts that the trial court erred by denying his motion to dismiss his improper-handling charge. R.C. 2923.16(B) prohibits transporting or having a loaded firearm in a motor vehicle if a person in the vehicle can access the firearm without leaving the vehicle.

1. <u>The State's historical evidence</u>

**{¶65}** The State points out that motor vehicles did not exist at the time of our nation's founding and acknowledges that it is unlikely to uncover a historical analogue. But citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022), the State argues that it is improper to infer the unconstitutionality of a statute due to the absence of historical laws regulating similar conduct. *Bruen*, however, said the opposite: "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Of course, motor vehicles did not exist at the time of the founding, but efforts to curb violence committed by those who are traveling certainly are nothing new.

**{¶66}** The State offered historical laws and argued that these laws permit Ohio

to restrict one's ability to have an accessible firearm in a vehicle.

**{¶67}** First, the State cites historical laws regulating the use and storage of firearms and gun powder around public roads. For instance, a 1713 Massachusetts law prohibited "the firing of guns on roads or highways." *See* Section 6, 1713-17 Province Laws, § 1, *An Act to Prohibit Shooting of Firing off Guns Near the Road or Highway on Boston Neck*.[2] The state enacted that law because "the limbs and lives of several persons have been greatly endangered, in riding over Boston Neck, by their horses throwing of them, being affrighted, and starting at the firing of guns by gunners that frequent there after game." *Id.* It accordingly prohibited any person from "discharge[ing] or fir[ing] off any gun upon Boston Neck, within ten rods of the road or highway leading over the same." *Id.* at § 1. A violation of the act resulted in the forfeiture of the firearm used in the offense and a fine. *Id.*

**{¶68}** But this law, and other laws cited by the State, are not relevantly similar to Ohio's improper-handling statute in either how or why they burden the right to bear arms. R.C. 2923.16(B) prevents the *possession* of an accessible firearm while in a motor vehicle. Many of the State's historical examples prohibited the *discharge* of weapons near roads. These analogues are more like R.C. 2923.16(A)'s prohibition on "knowingly discharg[ing] a firearm while in or on a motor vehicle." The historic statutes, at most, reflect a tradition of restricting the *use* of weapons on or around roads.

**{¶69}** Second, the State points to an 1871 Texas law permitting those "traveling in the state [to] keep or carry arms with their baggage." 1871 Tex. Gen. Laws 1322, art 6512. The *Bruen* court explained that the Texas law "forbade anyone from

---

[2]https://archives.lib.state.ma.us/server/api/core/bitstreams/b09dcaac-55d6-4528-8d05-ce7b4907555d/content (accessed March 6, 2025) [https://perma.cc/PY55-2A62].

'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Bruen*, 597 U.S. at 64, quoting 1871 Tex. Gen. Laws § 1. The Texas law made exceptions for weapons "carried as a means of self-defense." *Id.* It further permitted travelers to keep their weapons in their baggage, which is the provision the State cites for its support of Ohio's improper-handling scheme. While this Texas law provides some support for the State's position, we will not "give disproportionate weight to a single state statute" that *Bruen* discredited as an "outlier[]." *Id.* at 65.

{¶70} Third, the State notes that in the early-to-mid 19th century, several states regulated one's ability to carry concealed weapons. It asserts that most of these laws applied to those traveling through the state. But the State relies solely on a 1689 East New Jersey law. *Bruen* explained that the law's restrictions "applied only to certain 'unusual or unlawful weapons,' . . . and did not apply to all pistols, let alone all firearms." *Bruen*, 597 U.S. at 47-48. And as discussed above, many early concealed-carry prohibitions made exceptions for those traveling. Further, by its terms, the improper-handling statute would subject Barber to prosecution if Barber had a firearm accessible to him in his vehicle, regardless of whether that weapon was concealed. *See* R.C. 2923.16(B). And these 19th century concealed-carry laws applied only to weapons that were concealed—or were constitutional only to the extent that they did.

{¶71} Finally, the State cites to colonial laws authorizing the arrest of "'all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People.'" *See Bruen* at 46. *Bruen* explained that these laws "codified the existing common-law offense of bearing arms to terrorize the people." *Id.* at 47. The laws

"prohibited 'riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land.' Such conduct disrupted the 'public order' and 'led almost necessarily to actual violence.'" (Cleaned up.) *Rahimi*, 602 U.S. at 697, quoting 4 Blackstone 149, and *State v. Huntly*, 25 N.C. 418, 421-422 (1843). From these going armed laws, as well as historical surety laws, the *Rahimi* Court held that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi* at 698.

**{¶72}** The "going-armed" laws are the State's strongest historical analogue in support of upholding Barber's improper-handling charge. They demonstrate that historically, states could limit possession of a firearm by those traveling when they possessed weapons with an intent to cause violence or otherwise "disrupt[] the 'public order.'" *Id.* at 697. And notably, these laws could be enforced before a person had engaged in any affirmative act of violence.

**{¶73}** But under Barber's as-applied challenge to his improper-handling charge, we are not convinced that the going-armed laws are relevantly similar to Barber's improper handling charge. First, *Bruen* read an "intent-to-terrify requirement" into the affray laws. *See Bruen*, 597 U.S. at 119 (Breyer J., dissenting) (disagreeing with the *Bruen* majority's determination that affray laws only applied to those possessing the intent to terrify). There is no suggestion that Barber possessed any intent to terrorize, and R.C. 2923.16(B) requires nothing more than Barber's knowledge that a firearm was accessible to him without leaving the vehicle.

**{¶74}** Moreover, *Bruen* explained that these going-armed laws typically were limited to "dangerous or unusual weapons." *Bruen* at 46; *Rahimi*, 602 U.S. at 697.

[T]he Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are

23

highly unusual in society at large." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*(*Cleaned up.) *Bruen* at 47, quoting *Heller*, 554 U.S. at 627-629. These laws targeted individual's specific conduct: either wielding a weapon to cause terror or otherwise carrying a dangerous or unusual weapon that was likely to cause terror. That Barber's conviction involved his simply possessing a handgun in a vehicle cuts against the going-armed laws serving as an analogue.

**{¶75}** The State failed to present a historical analogue showing that Ohio's improper-handling statute, as applied to Barber, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See Bruen* at 19. Without historical laws relevantly similar to Ohio's improper-handling law, the State is left with its dangerousness rationale.

> 2.    The State's "dangerousness" rationale does not support Barber's improper-handling conviction

**{¶76}** R.C. 2923.16(B) prohibits people from "knowingly transport[ing] or hav[ing] a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

**{¶77}** But R.C. 2923.16(B)'s prohibition against transporting an accessible

firearm in a vehicle "generally does not apply to one who has 'been issued a concealed handgun license that is valid at the time in question.'" *State v. Barber*, 2023-Ohio-2991, ¶ 18 (6th Dist.), citing R.C. 2923.16(F)(5)(a). And, as discussed above, R.C. 2923.111 entitles "qualifying adults" to the same rights and responsibilities as those that have obtained a license to carry concealed handguns. *Id.* at ¶ 20, citing R.C. 2923.111(B)(3). Therefore, "qualifying adults" who have "a loaded firearm in their vehicle without a concealed handgun license [are] no longer subject to prosecution for improperly handling firearms in a motor vehicle under R.C. 2923.16." *Id.*

{¶78} Based on the record before us, had Barber not been adjudicated delinquent for a CCW violation when he was 16 years old, he would be a "qualifying adult, not subject to prosecution under R.C. 2923.16." And as explained above, Barber's juvenile adjudication for a CCW violation fails to establish that he is presumptively dangerous.

{¶79} We therefore hold that the State has failed to meet its burden and R.C. 2923.16(B) is unconstitutional as applied to Barber. We sustain Barber's first assignment of error.

### C. Third Assignment of Error

{¶80} In his third assignment of error, Barber asserts that the trial court erred in denying his motion to dismiss his CCW charge in the 2024 case. Barber's motion in the 2024 case was identical to the motion he filed in the 2023 case. Barber did not argue that Ohio's excluding him from the definition of a "qualifying adult" due to his pending indictment in the 2023 case was unconstitutional as applied to him. Instead, his motion only challenged his exclusion due to his juvenile adjudication.

{¶81} Failing to challenge the constitutionality of a statute or the statute's application at the trial level forfeits that issue on appeal. *State v. Awan*, 22 Ohio St.3d

120, 120 (1986); *see State v. Woods*, 1997 Ohio App. LEXIS 3989, *7 (1st Dist. Sep. 5, 1997). Even when a constitutional issue is forfeited, an appellate court has discretion to consider the issue for plain error. *State v. Griffin*, 2020-Ohio-3707, ¶ 56 (1st Dist.). To show plain error, Barber must establish an "obvious error that affected the outcome of his case." *State v. Martin*, 2024-Ohio-10, ¶ 29 (1st Dist.). But when appellants fail to develop plain-error arguments, this court will not construct plain-error arguments for them. *State v. Jones*, 2018-Ohio-4754, ¶ 46 (1st Dist.)

**{¶82}** Barber did not develop a plain-error argument and we decline to develop one for him. We overrule Barber's third assignment of error.

### D.     Fourth assignment of error

**{¶83}** In his fourth assignment of error, Barber asserts that the trial court committed plain error by failing to merge his CCW and improper-handling sentences in the 2023 case. Given our disposition of Barber's first and second assignments of error, his fourth assignment of error is moot. We therefore dismiss the portion of Barber's appeal challenging the trial court's failure to merge his sentences in the case numbered B-2304389.

### V.     Conclusion

**{¶84}** For the foregoing reasons, we sustain Barber's first and second assignments of error and reverse his convictions for CCW and improper-handling in the case numbered B-2304389. Barber's fourth assignment of error is moot and we dismiss the portion of his appeal that challenges the trial court's failure to merge his sentences in the case numbered B-2304389. We overrule Barber's third assignment of error and affirm his conviction in the case numbered B-2400076.

Judgment accordingly.

**KINSLEY, J.,** concurs.

**ZAYAS, J.**, dissents.

**ZAYAS, J.**, dissenting.

**{¶85}** In this case, the parties agreed that the statutes Barber challenged restricted his Second Amendment rights. Barber argues that the trial court erred in applying the second prong of the test by concluding that the State established that the burden was "consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 17.

**{¶86}** The appellant's argument is limited to a challenge on whether the State met its burden. However, based on this record, we cannot determine anything beyond a denial of the motion, including whether the court conducted a *Bruen* analysis. The court's entry merely states that it "finds said motion to be not well-taken. Specific findings of fact and conclusions of law were read into the record and hereby denies same." The record is devoid of any factual findings or legal conclusions made by the trial court in ruling on the motion to dismiss. Moreover, the record is absent of any analysis regarding the constitutionality of the statutes at issue. Thus, we cannot determine whether the trial court applied *Bruen* in reaching its conclusion. *See State v. Storms*, 2024-Ohio-1954, ¶ 25 (1st Dist.) (noting that "the trial court did not address the constitutionality of Ohio's CCW statute as applied to Storms under *Bruen*.").

**{¶87}** Significantly, during the pendency of this appeal, the Supreme Court decided *Rahimi*, which provided further context on how to analyze a historical analogue. Although we have de novo review, I would remand the matter to the trial court, rather than apply *Bruen* and *Rahimi* for the first time on appellate review. *See State v. Long*, 2020-Ohio-5363, ¶ 29 (Kennedy, J., concurring in judgment) (stating that she "would remand the cause to the court of appeals to evaluate [the] speedy-trial claim in light of this court's decision clarifying the law"); *see also Long* at ¶ 31 (Fischer,

J., concurring in part and dissenting in part) (explaining that "because the court of appeals did not have the opportunity to consider this case in light of this court's clarification of the law, I would remand the cause to the Second District so that it may weigh the *Barker* factors in the first instance, applying the law as set forth by this court.").

{¶88} Therefore, I would sustain the first, second, and third assignments of error, reverse the trial court's judgment, and remand the cause to the trial court to analyze whether the challenged statutes are constitutional by applying the test set forth in *Bruen* and *Rahimi*. *See Storms* at ¶ 26 (holding that the trial court erred by failing to apply *Bruen* and remanding the cause to the trial court to conduct a *Bruen* analysis).

Please note:

The court has recorded its entry on the date of the release of this opinion.