[Cite as *State v. Beckley*, 2025-Ohio-4829.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO.    C-250087
                                           TRIAL NO.     B-2404976
    Plaintiff-Appellee,      :

  vs.                            :

DESANTO BECKLEY,                  :
                                           *JUDGMENT ENTRY*
    Defendant-Appellant.     :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/22/2025 per order of the court.**


**By:**_____
      **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250087 |
| | | TRIAL NO. B-2404976 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| DESANTO BECKLEY, | : | |
| | | *OPINION* |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 22, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Candace Crear,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David H. Hoffmann*, Assistant Public Defender, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} Following a bench trial in the Hamilton County Court of Common Pleas, defendant-appellant Desanto Beckley appeals his convictions for carrying a concealed weapon, possession of cocaine, and possessing a weapon while under disability. Beckley argues that the trial court erred in failing to suppress evidence obtained from his person and from the scene of a perimeter search after an anonymous tip led police to recognize him as the suspect in a recent shooting. Beckley further argues that his firearms convictions were against the manifest weight of the evidence and that the trial court committed plain error by failing to dismiss them as unconstitutional under the Second Amendment. As we explain in this opinion, we disagree with Beckley's contentions. We accordingly affirm the judgment of the trial court.

### *Factual and Procedural History*

{¶2} Beckley was indicted on October 22, 2024, following a shooting that took place on October 13, 2024. Beckley was subsequently apprehended on October 16, 2024, after an anonymous person called 911 to report Beckley's whereabouts.

{¶3} After being apprehended, Beckley was charged in a six-count indictment with felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, and accompanying specifications (Count 1); felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree (Count 2); having weapons under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree (Count 3); carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the fourth degree (Count 4); having weapons under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree (Count 5); and possession of cocaine in violation of R.C. 2925.11(A), a felony of the fifth degree (Count 6). Counts 1 through 3 alleged conduct related to the October 13th shooting, and Counts 4 through 6 alleged

conduct related to Beckley's October 16th encounter with police. The first three counts were eventually dismissed when the prosecuting witness did not appear in court, leaving only the charges arising from the October 16th incident.

{¶4} On December 12, 2024, Beckley filed a motion to suppress, arguing that officers did not have reasonable, articulable suspicion to stop him on October 16th. He further challenged the reliability of the anonymous call that led officers to his location.

### *Motion to Suppress*

{¶5} The trial court conducted an evidentiary hearing on Beckley's suppression motion. To rebut Beckley's claims that he was stopped without reasonable suspicion and that the 911 caller was unreliable, the State presented the testimony of two police officers, Cincinnati Police Officer Jason Lindle and Cincinnati Police Detective Carlos Cortez.

{¶6} Lindle testified that he became involved in the investigation of the October 13th shooting when police received an anonymous 911 call three days later on October 16th. According to Lindle, the caller reported that Beckley was at a specific location wearing the same distinctive clothing that the shooter wore on October 13th. Lindle did not initially speak with the caller. But he later returned the tipster's phone call as the investigation unfolded. From the details the caller provided in real time, Lindle ascertained that the caller could observe Beckley as he walked up the street to a store. The tipster also provided details about a maroon jacket that Beckley changed into as he moved about the area. Despite being sure that the caller could observe Beckley on October 16th, Lindle did not know the 911 caller's proximity to the location of the October 13th shooting.

{¶7} Lindle and other officers rallied at a local AutoZone to stage their

operation. A fellow officer, Detective Cortez, informed Lindle that Beckley was a suspect in the October 13th shooting. Lindle then drove his marked police cruiser to the street where Beckley was walking. While in his cruiser, but without his lights and siren on, Lindle approached Beckley, rolled down his window, and asked Beckley to talk. Beckley responded to Lindle by saying, "For what?" Sensing that Beckley might flee the scene, Lindle told Beckley not to run, but Beckley quickly took off.

{¶8} Lindle chased Beckley through a residential area, until Beckley jumped a fence and got away. Lindle and his fellow officers then established a perimeter in an attempt to locate Beckley. Lindle ultimately found him hiding in a tow truck. At the time, Beckley was wearing a black hoodie with white lettering and black Nike sweatpants. Lindle handcuffed Beckley, placed him under arrest, and searched him, although he did not find any contraband. Following the chase, a K9 unit was dispatched to the area.

{¶9} Cortez testified that, on October 13th, he received a report that a person had been shot on Woodlawn Avenue in Price Hill. He responded to the scene and spoke with an anonymous eyewitness who was too fearful to provide his name. The anonymous witness described the shooting suspect as a black male with facial tattoos who was wearing a black hoodie with the words "Deep Step" written on the front. The witness reported that, minutes after the shooting, the suspect fled to a Marathon gas station. Following this lead, Cortez retrieved video footage from Marathon that corroborated the anonymous eyewitness's description of the suspect.

{¶10} Cortez further testified that, on October 16th, police received a tip from an anonymous 911 caller. The tipster reported that the suspect from the October 13th shooting was walking on Woodlawn Avenue wearing the same distinctive black sweatshirt and carrying a green and black bag with a gun inside. Responding to the

tip, Cortez sent officers to the Woodlawn Avenue area. Working undercover, he parked his own car next to Marathon and saw a person, whom he later identified as Beckley, walk towards the gas station with a green and black bag strapped across his shoulders.

{¶11} As the scene unfolded, Cortez learned more information. The 911 tipster called a second time and indicated that the suspect had changed his sweatshirt. Cortez then noticed that Beckley was wearing a different shirt but was unable to recall what it looked like. Cortez accordingly asked his fellow officers to stop Beckley to investigate. But as Lindle approached Beckley, Beckley did not want to speak with him and instead took off running.

{¶12} Cortez and Lindle then chased after Beckley, and Beckley was ultimately apprehended. Shortly thereafter Cortez observed a bag, which he later identified as the same one Beckley was previously carrying, at the bottom of a residential basement stairwell in the same vicinity that Beckley had fled. He looked inside and found a Taurus T3 9 mm firearm.

{¶13} Cortez then searched Beckley and located cocaine inside his pants pocket. Cortez explained that the Woodlawn Avenue area where Beckley was apprehended was known for high crime, that he considered the area to be dangerous, and that he used extra caution because the 911 caller reported that Beckley was armed.

{¶14} On cross-examination, defense counsel pointed out the absence of the suspect's identifying facial features in Cortez's investigative report. Cortez also conceded the absence of height, weight, and a description of facial tattoos in the 911 caller's tip. Cortez clarified that he never saw Beckley with a gun, that Beckley denied having a gun, and that although Beckley's DNA and fingerprints were taken, they were not found on the gun. When asked about the bag he found at the bottom of the steps,

Cortez stated it was red and black.

{¶15} On redirect, Cortez testified that the bag was green and brown. The State refreshed Cortez's recollection by showing him a picture of a brown bag, and he identified it as the bag Beckley was wearing on October 16th. Cortez further testified that the bag was recovered within about five minutes of Beckley being arrested.

{¶16} On recross, Cortez conceded that the bag in the picture was brown and that, contrary to his testimony, it was not green, red, or black.

### *Trial Court's Resolution of the Motion to Suppress*

{¶17} On January 31, 2025, the trial court entered a written decision denying Beckley's motion to suppress. In it, the trial court made a number of factual findings as to the basis for the officers' October 16th encounter with Beckley.

{¶18} First, the trial court found that the Marathon video footage depicted the October 13th shooting suspect—a black male with facial tattoos wearing a black sweatshirt with pronounced white lettering. It also found that the victim of the October 13th shooting identified the suspect from the video.

{¶19} Second, the trial court found that the October 16th anonymous caller identified the October 13th shooting suspect by his location, attire, and lettering on the sweatshirt. The trial court further found that Cortez identified Beckley on October 16th as the suspect from the Marathon video footage. The trial court determined that Beckley was wearing the same clothing on October 16th as he was wearing on October 13th and that he was in possession of a shoulder bag. It also found that he was wearing the same clothing in court for the suppression hearing.

{¶20} Third, the trial court determined that the suspect fled when the police initiated contact but he was later detained. The officers then conducted a *Terry* search and located a bag of cocaine. The trial court also found that, approximately five

minutes after Beckley was detained, officers located an abandoned shoulder bag behind a residential property. The bag contained a Taurus 9 mm gun.

{¶21} Fourth, the trial court determined that Beckley denied possessing a gun, but admitted that he possessed the shoulder bag.

{¶22} In denying Beckley's suppression motion, the trial court concluded that the anonymous tip had been verified and therefore exhibited sufficient indicia of reliability to justify an investigatory stop. It further concluded that Cortez's identification of Beckley on October 16th as the shooting suspect from the Marathon video footage gave officers probable cause to arrest him when he was found in the tow truck. The trial court also concluded that probable cause existed to search for weapons once Beckley was in custody given the high-crime area, Beckley's flight, the tip that he was armed, Cortez's identification, and Cortez's discovery of cocaine in Beckley's pocket. Finally, the trial court held that Beckley voluntarily abandoned the bag and therefore lost standing to challenge its seizure.

### *Trial*

{¶23} On January 31, 2025, the matter proceeded to a bench trial. The parties stipulated that Beckley was under a disability as of October 16, 2024, that prevented him from lawfully possessing a firearm, that the firearm was operable, and that a lab report as to the cocaine found in Beckley's pocket was admissible without the testimony of a lab technician to authenticate it.

{¶24} The State called three witnesses at trial: Lindle, Officer Braeden Knapp, and Cortez. Beckley testified on his own behalf.

{¶25} Lindle testified to the events of October 16th. Officers received an anonymous 911 call that day reporting a person in the Price Hill neighborhood who was in possession of a firearm. Lindle and his fellow officers then convened in the area

to look for the suspect. Although not entirely confident in his recollection, Lindle testified that the tipster's initial description was that the suspect was wearing a maroon jacket and black pants.

{¶26} Lindle then spotted Beckley walking down Woodlawn Avenue. Lindle recalled that Beckley was wearing black sweatpants and a purplish or maroon jacket with camouflage on the sleeves. When asked if Beckley was in possession of any accessories, Lindle testified that Beckley was carrying a light blue crossbody bag, which he later identified in a photograph. Lindle approached Beckley and told him that he wanted to speak with him. Beckley responded, "For what?" Lindle attempted to answer, but Beckley ran off.

{¶27} Lindle gave chase through a residential area, but Beckley got away despite Lindle's attempts to tase him. Lindle and his fellow officers then set up a police perimeter in order to trap Beckley. Shortly thereafter, a resident of the neighborhood directed Lindle's attention to a tow truck where Beckley's feet were dangling from an open door. According to Lindle, Beckley exited the passenger door of the tow truck. He was no longer wearing the maroon jacket, and he was no longer carrying the crossbody bag. Lindle promptly handcuffed Beckley and placed him in custody.

{¶28} Lindle identified the bag Beckley had previously possessed as being the same bag that was recovered from the bottom of a basement stairwell. He clarified that the bag was light blue.

{¶29} Knapp, a Cincinnati Police Department ("CPD") officer in the K9 unit, testified that he and his canine responded to the Woodlawn Avenue area on October 16th after receiving a call that a shooting suspect had fled a police encounter. Knapp and his dog unsuccessfully searched the area for the suspect for about 15 to 20 minutes. Knapp then conducted a second canine search for articles. During this

second search, Knapp and his canine located a crossbody bag at the bottom of a basement stairwell in an area they had not searched before.

{¶30} Cortez testified to his role as a CPD investigator assigned to the Price Hill neighborhood. Prior to October 16th, Cortez was familiar with Beckley by his picture from the Marathon surveillance footage, but did not know him by name.

{¶31} When the anonymous 911 tip informed police of Beckley's whereabouts on October 16th, Cortez, then undercover, observed Beckley's movements. He saw Beckley speak with a group of people at the corner of Woodlawn Avenue and Warsaw, then walk towards a Marathon gas station, and then walk back to Woodlawn Avenue. Beckley was wearing a black hoodie bearing the words "Deep Steppa," black pants, and a brown shoulder bag. Cortez identified the bag that was retrieved from the basement stairwell as the one in Beckley's possession.

{¶32} After Lindle apprehended Beckley, Cortez searched his person and discovered a white powdered substance in Beckley's pants pocket. A lab report introduced by the State confirmed that the substance was in fact cocaine. Cortez also searched inside the crossbody bag and located a firearm. Subsequent DNA and fingerprint tests on the gun proved inconclusive.

{¶33} Cortez interviewed Beckley at the police station after his arrest. The State did not present any written or recorded evidence as to what Beckley actually said during his interview with Cortez. But according to Cortez, Beckley admitted that he was in possession of cocaine and that he had purchased the bag from someone else, but denied knowing there was a gun inside it. On cross-examination, Cortez conceded that he never saw Beckley with a gun.

{¶34} Following Cortez's testimony, the State rested, and defense counsel moved for acquittal under Crim.R. 29. The motion was denied.

{¶35} Beckley then took the stand. He testified that he was present in the Woodlawn Avenue area on October 16th for an innocuous reason—to get his car fixed. When the police approached him, he rejected their conversation based on reports of improper police impersonations in the area. Beckley was aware that the police were looking for him before he encountered Lindle. He was scared, because he had previously been shot, because he believed there was "a hit out on" him, and because his mother had been robbed.

{¶36} Beckley was wearing the same clothing at trial that he was wearing on the day he was arrested: a black sweatshirt, black sweatpants, and white Nike shoes. Regarding the crossbody bag, Beckley denied that the bag recovered from the bottom of the stairs was his. He claimed to be wearing a green fanny pack with triangles rather than the brown bag the police located at the scene. He indicated the bag he discussed with officers was a green bag containing Chinese money and a bus pass, not a gun.

{¶37} Beckley further denied that the gun and the cocaine were his. He claimed to be unaware that he had drugs in his pocket and disclaimed using any unlawful drugs. Beckley did admit, however, to selling marijuana.

{¶38} During cross-examination, the State played footage from Lindle's body-worn camera, which depicted Lindle removing a maroon jacket from Beckley's sweatshirt pocket.

{¶39} The trial court found Beckley guilty of Counts 4 through 6. It sentenced Beckley to 12 months in prison on Count 4, 30 months in prison on Count 5, and six months in prison on Count 6, to be served concurrently, for an aggregate sentence of 30 months, subject to 110 days of credit for pretrial detention. The trial court remitted all fines and court costs.

{¶40} Beckley appeals.

*Analysis*

**{¶41}** Beckley raises three assignments of error for our review. His first assignment of error challenges the trial court's resolution of his suppression motion. His second assignment of error argues that his firearm convictions are against the manifest weight of the evidence. His final assignment of error, which was not preserved below, contends that the trial court committed plain error in failing to dismiss the firearms charges under the Second Amendment.

### A. Motion to Suppress

**{¶42}** In his first assignment of error, Beckley asserts that the trial court erred in denying his motion to suppress. We review a motion to suppress under a blended standard of review. *See In re J.T.*, 2023-Ohio-2695, ¶ 15-16 (1st Dist.). Under this standard, we accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* at ¶ 15. We then review de novo whether the facts meet the applicable legal standard. *Id.*

**{¶43}** Beckley raises two points of contention with regard to the trial court's denial of his suppression motion. He argues first that he was detained when police established a tight perimeter in the Woodlawn Avenue neighborhood and that police lacked reasonable suspicion to justify the perimeter search. Next, he contends that the October 16th anonymous 911 call was unreliable and therefore could not constitutionally inform Lindle's decision to stop him.

**{¶44}** We note initially that neither of these arguments directly challenges the search of the crossbody bag, nor could they. The trial court found below that Beckley lacked standing to challenge that aspect of the police investigation in this case because he voluntarily abandoned the bag when he fled from his encounter with Lindle, and the State repeated that argument in its response brief on appeal. We agree with this

conclusion.

**{¶45}** "A defendant has no standing under the Fourth Amendment to the United States Constitution to object to a search and seizure of property that he has voluntarily abandoned." *State v. Moten*, 2012-Ohio-6046, ¶ 16 (2d Dist.), citing *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph two of the syllabus. A defendant voluntarily abandons property when he throws it to the ground while being pursued by police. *See State v. Thornton*, 2023-Ohio-1404, ¶ 33 (2d Dist.). Beckley did exactly that—he discarded the crossbody bag while fleeing his encounter with Lindle. Because Beckley abandoned the bag, he lacks standing to challenge Cortez's subsequent search of its contents. Thus, to the extent either of Beckley's contentions in his first assignment of error indirectly challenge the search of the crossbody bag, Beckley has no standing to pursue those arguments.

**{¶46}** Neither can Beckley argue on appeal that the police perimeter constituted an unlawful detention. Beckley did not raise this argument before the trial court, and he therefore waived it for appellate review. *See State v. Miller*, 2025-Ohio-2423, ¶ 10 (1st Dist.); *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1998) ("Failure on the part of the defendant to adequately raise the basis of his [suppression] challenge constitutes a waiver of that issue on appeal.").

**{¶47}** This leaves Beckley's contention that the 911 tip was not sufficiently reliable to form the basis of Lindle's *Terry* stop. "An investigatory stop is permissible if a law enforcement officer has a reasonable suspicion, based on specific and articulable facts, that the individual to be stopped may be involved in criminal activity." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). This standard may be met by information supplied by informants, who fall into three categories: "(1) anonymous informant[s], (2) known informant[s] (someone from the criminal world who has

13

provided previous reliable tips), and (3) identified citizen informant[s]." *State v. Tidwell*, 2021-Ohio-2072, ¶ 29.

**{¶48}** Of the three, anonymous tips are the most inherently unreliable. *Id.* at ¶ 31. Thus, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations[.]" *Alabama v. White*, 496 U.S. 329, 330 (1990). "Without any predictive information, an anonymous tip leaves police without means to test the informant's knowledge or credibility." (Cleaned up.) *State v. Currie*, 2025-Ohio-670, ¶ 27 (1st Dist.). However, "[l]aw enforcement may rely upon an anonymous tip if it is suitably corroborated." *Id.* This can occur when the tipster provides specific, verifiable details based on the informant's firsthand knowledge and officers are able to at least partially corroborate that the tip is correct. *See Tidwell* at ¶ 51-54.

**{¶49}** Beckley focuses his attention on appeal to the question of whether the 911 caller's report was sufficiently corroborated to be reliable. But, according to the trial court's factual findings in resolving the motion to suppress, the 911 call was not the sole reason that Lindle stopped Beckley on October 16th. According to the trial court, after the caller alerted police to Beckley's whereabouts, Cortez separately identified Beckley as the October 13th shooting suspect based on his own independent observations. Cortez watched Beckley move about the Woodlawn Avenue area on October 16th and then matched Beckley to the Marathon footage from three days earlier. Only after Cortez made this identification did Lindle stop Beckley for questioning.

**{¶50}** Cortez's firsthand observation created reasonable suspicion to support Lindle's stop. Cortez himself interviewed the October 13th eyewitness, accessed the

Marathon surveillance footage that corroborated the eyewitness's description of the suspect, and personally compared Beckley's appearance on October 16th to the person depicted in that footage. None of this involved information supplied by the anonymous 911 caller.

{¶51} Moreover, to the extent Cortez and Lindle relied on the 911 tip to support their suspicion, the anonymous tip was sufficiently corroborated to be reliable. The 911 caller knew that the individual wearing a "Deep Step" sweatshirt was the October 13th suspect—information only someone with close connection to the shooting or suspect could know. That lent credibility to its truthfulness right out of the gate. Moreover, the caller reported ongoing information as to Beckley's whereabouts and changes to his attire that were verified by what officers observed at the scene. The fact that the caller's tips matched what was occurring in real time also gave credence to its reliability.

{¶52} Beckley's challenge to the trial court's denial of his suppression motion accordingly fails. Lindle had reasonable, articulable suspicion to stop Beckley for questioning based on the fact that Cortez identified him as the October 13th shooting suspect. To the extent that determination was based at all on an anonymous 911 call, the tip was sufficiently corroborated to be reliable. We accordingly overrule Beckley's first assignment of error.

### B. Manifest Weight

{¶53} In his second assignment of error, Beckley argues that his firearm convictions are against the manifest weight of the evidence. When considering a challenge to the weight of the evidence and all reasonable inferences, the court must consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the court clearly lost its way and created a manifest miscarriage of

justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In assessing a manifest-weight challenge, this court reviews the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of all witnesses. *State v. McKelton*, 2016-Ohio-5735, ¶ 328. After review, we must consider whether the jury clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Wilks*, 2018-Ohio-1562, ¶ 140.

**{¶54}** Beckley was convicted of carrying a concealed weapon under R.C. 2923.12(A)(2), which states that "[n]o person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following * * * (2) A handgun other than a dangerous ordnance." Beckley was also convicted of possessing a weapon under disability. *See* R.C. 2923.13(A)(3). Both of these crimes require possession of a firearm as an essential element of the offense.

**{¶55}** Focusing on the weight of the evidence, Beckley contends too little evidence supports the trial court's conclusion that he possessed the Taurus 9 mm firearm contained in the abandoned crossbody bag. Beckley does have a point, in that the State presented very little evidence about the actual gun. Neither the gun itself, nor any photographic or video evidence of the gun, was presented at trial. Cortez merely testified that he saw the gun when he opened the crossbody bag at the scene.

**{¶56}** Nonetheless, even considering the State's scant presentation about the actual gun, the weight of the evidence supports Beckley's firearms convictions. The anonymous 911 caller reported that Beckley was carrying a bag with a gun inside. Lindle saw Beckley carrying a crossbody bag at his first encounter, but after Beckley fled, he no longer had the bag. Knapp and his canine recovered the bag at the bottom of a basement stairwell, and both Cortez and Lindle identified the bag as the one

previously worn by Beckley.  In his own testimony, Beckley even admitted that he had recently purchased a bag, although he contended it contained Chinese money and a bus pass, not a gun.

{¶57}  What is more, Beckley and the State stipulated that the gun was operable.  While Beckley is correct that the stipulation did not pertain to any specific gun, there was no other gun at issue in this case besides the Taurus 9 mm.

{¶58}  We acknowledge that the record contains some discrepancies as to the witnesses' description of the bag.  Lindle testified it was light blue, and Cortez seemed confused about its color.[1]  But these minor inconsistencies do not undermine the otherwise convincing evidence that Beckley possessed a crossbody bag containing a gun before voluntarily discarding it in a stairwell.

{¶59}  Ultimately, the trial court was in the best position to assess the credibility of the witnesses and to weigh the evidence.  *State v. Brown*, 2024-Ohio-2148, ¶ 19 (1st Dist.).  While the State's evidence on the firearms charges was not abundantly overwhelming, we cannot say that this is the exceptional case in which the manifest weight of the evidence cuts against conviction.

{¶60}  We overrule Beckley's second assignment of error.

### C.  Bruen Challenges

{¶61}  In his third assignment of error, Beckley argues that the trial court committed plain error in failing to dismiss his firearms charges under the Second and Fourteenth Amendments to the United States Constitution and Article 1, Section 4 of the Ohio Constitution.  Relying on *New York State Rifle & Pistol Assn., Inc. v. Bruen*,

---

[1] At the suppression hearing, Cortez initially testified that the bag was green and black, then said it was red and black, then green and brown, and then, after being shown a picture of the bag by the State, agreed the bag was brown.

597 U.S. 1 (2022), he contends that Ohio's carrying-concealed-weapon statute and weapons-under-disability statute are unconstitutional, both facially and as-applied.

**{¶62}** As Beckley concedes, he failed to advance these arguments below. We accordingly review them solely for plain error. *State v. Barber*, 2025-Ohio-1193, ¶ 81 (1st Dist.). To establish plain error, Beckley must demonstrate an "obvious error that affected the outcome of his case." *Id.*

**{¶63}** Beckley challenges two statutes, each of which imposes restrictions on his ability to possess firearms. The first, Ohio's weapons-under-disability statute, disarms adults if they have "been convicted of any felony offense involving the illegal possession . . . [of] any drug of abuse." *See* R.C. 2923.13(A)(3). The disarmament is permanent unless the individual is granted judicial release. *See* R.C. 2923.14. The second, Ohio's carrying-concealed-weapons statute, prohibits individuals who are not "qualifying adult[s]" from carrying a firearm in a concealed manner. *See* R.C. 2923.12(A)(2); R.C. 2923.111. Beckley does not meet the definition of a qualifying adult because of his criminal history. *See* R.C. 2923.111(A)(2)(b).

**{¶64}** Beckley does not identify an obvious error by the trial court in failing to declare either provision unconstitutional on its own accord. With regard to those who merely possess, rather than traffic, drugs of abuse, some federal courts and one dissenting judge in Ohio have questioned whether the government can categorically disarm drug users based on their perceived dangerousness. *See United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024) (finding federal weapons ban for those convicted of drug use to be unconstitutional as applied to defendant who was sober at the time of arrest); *United States v. Cooper*, 127 F.4th 1092 (8th Cir. 2025) (holding that the federal weapons ban is unconstitutional as applied to all drug users categorically but constitutional where individual drug users pose a danger to others or

engage in terrifying conduct); *State v. Skaggs*, 2024-Ohio-4781 (5th Dist.) (King, J., dissenting) (holding that R.C. 2923.13(A)(3) is unconstitutional as applied to felons convicted of drug possession).

**{¶65}** But the Fifth District upheld R.C. 2923.13(A)(3) against this very challenge. *See Skaggs* at ¶ 28. And both the Fifth and Eighth Districts have rejected plain error arguments of the variety made here, in part because *Bruen* errors are not obvious. *See State v. Jenkins*, 2024-Ohio-1094 (5th Dist.); *State v. Johnson*, 2024-Ohio-1163 (8th Dist.).

**{¶66}** The landscape with regard to R.C. 2923.12 is no less complex. In *Barber*, 2025-Ohio-1193 (1st Dist.), we determined that R.C. 2923.12(A)(2) was unconstitutional as applied to a person whose juvenile adjudication for carrying a concealed weapon prohibited the person from being a "qualified adult" permitted to carry a concealed weapon. In *State v. Hall*, 2025-Ohio-1644 (1st Dist.), we concluded that Ohio may categorically ban some citizens from carrying concealed weapons, including those facing pending misdemeanor assault charges, so long as those citizens remain able to openly carry weapons for self-defense. Both *Barber* and *Hall* have been accepted for review by the Ohio Supreme Court.

**{¶67}** Given the uncertainty of the law in this area and the lack of any precedent directly compelling the result that Beckley seeks, we decline to hold that there was an *obvious* error in the trial court's decision to adjudicate, rather than dismiss, his firearms charges. We accordingly overrule Beckley's third assignment of error.

### *Conclusion*

**{¶68}** The trial court did not err in denying Beckley's motion to suppress or in failing to dismiss Beckley's firearms charges under the Second Amendment, nor were

Beckley's convictions against the manifest weight of the evidence. We therefore overrule Beckley's assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

**BOCK** and **NESTOR, JJ.,** concur.